**ERICKSON–SHAVER CONTRACTING CORPORATION**

v.

**The UNITED STATES.**

**No. 214–82C.**

United States Claims Court.

Dec. 30, 1985.

George W. Coleman, Santa Monica, Cal., for plaintiff.

Colvin W. Grannum, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

SETO, Judge.

This action arises from a contract to raise a dike embankment adjacent to the San Luis Canal in Fresno County, California. Plaintiff asserts that during the course of performance, it encountered a "differing site condition" because its earth-moving equipment became mired in excessively wet material not indicated in the contract documents. As a result, it seeks an equitable adjustment for the increased cost of performance allegedly occasioned by this condition. Plaintiff also claims that it is entitled to additional compensation for 22,023 cubic yards of borrow material excavated and placed on the embankment beyond the neatline but within the allowed tolerances.

## BACKGROUND

On November 4, 1980, plaintiff, Erickson-Shaver Contracting Corporation, entered into a fixed-price construction contract (No. 1–07–20–CO111) with the U.S. Department of the Interior (Water and Power Resources Service) to raise 2.6 miles of dike embankments adjacent to the west bank of the San Luis Canal in Fresno County, California. Plaintiff commenced performance on December 3, 1980 and completed all onsite work by January 17, 1981, well within the 90–day construction period required by the contract. On January 9, 1981, however, plaintiff notified the government that it had encountered what it considered a differing site condition consisting of isolated subsurface mud between stations 4533 and 4561 of the borrow area.[1] Plaintiff claimed that the subsurface conditions encountered at the site differed materially from those indicated in the contract and increased its cost of performance by reducing equipment productivity. Additionally, plaintiff advised the government, subsequent to completion of the onsite work, that it intended to claim payment for the additional quantity of material excavated from the borrow and placed on the embankment beyond the neatline but within construction tolerances allowed during performance.

On February 26, 1981, plaintiff submitted the two claims, totalling $25,972.07, to the contracting officer by exception on its release of claims. In particular, plaintiff sought $7,913.21 under the differing site conditions clause and $18,058.86 for the additional material placed on the embankment. In his decision of June 16, 1981, the contracting officer found that plaintiff was not entitled to any additional compensation and denied both claims. On April 29, 1982, plaintiff instituted a "direct access" action in our predecessor court under the Contracts Dispute Act of 1978, 41 U.S.C. § 601 et seq. This matter is before the court for decision following a seven-day trial.

## DISCUSSION

A. *Differing Site Condition Claim*

■ The Differing Site Conditions clause of the contract at issue provides that contractors may seek adjustments in the con-

---

**1.** The borrow area is defined as the place from which earth is taken for use elsewhere.

tract price in two general situations. In the first situation (Type I), the subsurface or latent physical conditions encountered at the site must differ materially from the conditions indicated in the contract before an equitable adjustment will be granted. Therefore, a Type I claim requires a delineation of those physical conditions that could be expected from an examination of the contract. *See Foster Construction Co. v. United States*, 193 Ct.Cl. 587, 435 F.2d 873 (1970). In essence, the underlying issue in a Type I claim is whether the contractor could reasonably have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents, his inspection of the site, and his general experience as a contractor. *See Perini Corp. v. United States*, 180 Ct.Cl. 768, 780, 381 F.2d 403, 410 (1967); *Kaiser Industries Corp. v. United States*, 169 Ct.Cl. 310, 340 F.2d 322 (1965).

■ In the second situation (Type II), an equitable adjustment will be granted where the contractor encounters unusual physical conditions differing materially from those ordinarily encountered and generally recognized as inhering in the work of the character provided for in the contract. Thus, for a Type II claim, the contractor need only demonstrate that the actual conditions differed materially from those normally expected. *See United Contractors v. United States*, 177 Ct.Cl. 151, 368 F.2d 585 (1966).

■ The Differing Site Conditions clause therefore permits the contractor to submit a bid secure in the knowledge that an equitable adjustment in the contract price will be granted where the conditions encountered differ materially from those reasonably anticipated. *See Woodcrest Construction Co. v. United States*, 187 Ct.Cl. 249, 408 F.2d 406 (1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2164, 28 L.Ed.2d 542 (1970). By protecting the contractor from suffering the burden of dealing with unforeseen circumstances, the clause eliminates the speculation often present in sub-

surface operations and thereby works to reduce inflated bidding. *Kaiser Industries*, 169 Ct.Cl. at 323, 340 F.2d at 329 (1965). Therefore, to the extent the conditions described in the contract materialize, the contractor bears the risk, while the government assumes the risks for conditions the contract documents fail to disclose.

■ In the instant case, plaintiff states a Type I claim. In particular, plaintiff alleges that on January 7–9, 1981, it encountered muddy conditions below the top two feet of excavation in the borrow area between stations 4533 and 4561. (Plaintiff's Exhibit ["PX"] 3.) Plaintiff asserts that it was not reasonable to anticipate such conditions because the contract contained no indication of subsurface mud. Defendant rejoins that the contract documents, together with other information available to plaintiff, were sufficient to put plaintiff on notice that it was likely to encounter wet subsurface conditions during excavation of the borrow area. In support of its position, defendant adverts to the logs of five auger holes ("AH") taken at the work site. Each of the five logs, which were included in the contract, notes the location of the auger hole and indicates both the type of material encountered at any particular depth and its percent moisture.

The threshold issue, therefore, is whether plaintiff, at the time it prepared its bid, reasonably could have anticipated the wet subsurface conditions encountered from an examination of the logs of auger holes AH–1 through AH–5. In other words, did the muddy conditions plaintiff experienced on January 7–9, 1981 differ materially from the auger hole data? In determining what the auger hold data disclose about subsurface conditions at the site, however, the court recognizes that the issue is not what conditions a contractor should expect at any particular auger hole location, but rather what he should expect *throughout the site* from an examination of the data from all the boring locations. Therefore, the log of any particular auger hole is

important only insofar as it provides insight to the overall soil character at the site.

Because the auger holes were spaced several thousand feet apart, their logs do not purport to establish a clear soil profile. (Transcript of Proceedings ["Tr."] at 283–86.) Indeed, the soil profile along the borrow area is a continuum, not following any distinct pattern and without definitive boundaries. Thus, it would be unrealistic to expect to find the soil configurations reported in the logs other than at the points the auger holes were made. The logs are only a guide to the general nature of the soil i.e., snapshots of its configuration. As such, however, they are sufficient to put a contractor on notice of potentially significant variations along the length of the borrow area.

In general, the logs indicate a wide variation of both soil type and percent moisture at any given level. In discussing the significance of the listed moisture levels, the parties' expert witnesses examined the logs of auger holes AH–4 and AH–5, the holes closest to the area where plaintiff encountered subsurface mud. The log of *Hole No. AH–4* sets forth in pertinent part the following information:

Classification

| | |
|---|---|
| 0.0 to 3.0 ft: | sandy clay |
| 3.0 to 6.0 ft: | silty sand |
| 6.0 to 8.0 ft: | lean clay |

Field Moisture

| Interval | Percent Moisture |
|---|---|
| 0.0 – 2.0 feet | 25.3 |
| 2.0 – 4.0 feet | 18.7 |
| 4.0 – 6.0 feet | 29.8 |
| 6.0 – 8.0 feet | 38.0 |

The log of *Hole No. AH–5* reports the following information:

Classification

| | |
|---|---|
| 0.0 to 6.0 feet: | lean clay |
| 6.0 to 8.0 feet: | sandy clay |

Field Moisture

| Interval | Percent Moisture |
|---|---|
| 0.0 – 2.0 feet | 24.7 |
| 2.0 – 4.0 feet | 29.6 |
| 4.0 – 6.0 feet | 35.8 |
| 6.0 – 8.0 feet | 22.8 |

The soil types present at these auger holes include silty sand, sandy clay and lean clay. The photographs plaintiff proffered as Exhibit 9 indicate that the wet material encountered by plaintiff's earth-moving equipment at a depth of approximately three feet was clay. (Tr. at 260–61.) Both plaintiff's expert witness, Mr. Richard Frankian, and defendant's expert, Mr. William Mitchell, testified that the optimum moisture [2] for lean clay was approximately 28–30%. (Tr. at 273, 835.) Mr. Mitchell further testified that lean clay with a 35–38% moisture content would be wet. (Tr. at 828, 839.) Moreover, Mr. Frankian testified that without at least one foot of cover material, lean clay at 38% moisture could cause the muddy conditions encountered. (Tr. at 296.)

Hole No. AH–4 shows lean clay with a moisture content of 38% at depths of 6–8 feet. Similarly, Hole No. AH–5 shows lean clay with moisture contents ranging from 24.7% at 0–2 feet to 35.8% at 4–6 feet. Because the muddy conditions were encountered between the location of AH–4 and AH–5, it is reasonable to assume that the soil profile in that area would be a reasonable variation of those shown in the logs. Thus, the logs clearly raise the specter that lean clay of approximately 38% moisture could be present at depths of 3–4 feet, without sufficient cover material to prevent muddy conditions. Indeed, Auger Hole 2 shows lean clay with a moisture content of 48% at a depth of 4 feet. Therefore, by examining the auger hole data, plaintiff should have anticipated the likelihood of muddy conditions, caused by high moisture lean clay, at some point along the borrow area.[3]

---

2. The optimum moisture of a soil is that moisture at which the material is easiest to compact to its maximum density, without causing construction equipment to become mired. (Tr. at 835.)

3. Moreover, Mr. Mitchell testified that silty sand with a 29.8% moisture content, as is found at 4 feet in AH–4, would be wet enough to cause muddy conditions. (Tr. at 839, 875.) This testimony lends further support to the conclusion that plaintiff should have anticipated such conditions.

Furthermore, other factors should have alerted plaintiff that wet subsurface conditions might be encountered in the borrow area, especially in light of the auger hole data. For example, the borrow area receives large amounts of surface water annually, including irrigation runoff and seasonal rains. (Tr. at 680, 702, 919.) The area in question receives its heaviest rainfall during the winter months, from December through March. (Tr. at 441–42, 919.) As a result, it is often difficult to perform earthwork construction because of the wet subsurface conditions. (Tr. at 186–87, 191, 444, 919.) Additionally, the testimony establishes that an inspection of the borrow area immediately prior to the bidding disclosed "shrinkage cracks" or "checking" of the surface—an indication that at one time surface water was present. (Tr. at 765, 795, 840–42.)

Plaintiff contends that these factors are irrelevant because it observed no irrigation runoff between the time the auger hole tests were taken and construction began, and because it did not rain during the construction period. Plaintiff's argument, however, is without merit. These other factors, together with the auger hole data, were sufficient to put plaintiff on notice, at the time of bidding, of potential problems with subsurface water. The court's inquiry involves the contractor's reasonable expectations at the time it submitted its bid. At that time, the prospect of rain and irrigation runoff during the construction period posed potential problems for plaintiff which it should have incorporated in its bid. The failure of these conditions subsequently to materialize does not affect their import as of the bid date. Plaintiff is attempting to apply hindsight to a prospective evaluation it was obligated to make before it submitted its bid. The court cannot accept this convoluted approach.

Therefore, in light of all the information available at the time of bid submission, plaintiff should have anticipated encounter-ing wet subsurface conditions at some point along the borrow area. Because the conditions ultimately encountered were not materially different from those indicated, plaintiff's differing site condition claim is denied.

B. *Claim for Additional Excavation From the Borrow*

■ Plaintiff's second claim raises the issue of whether the contract provides for payment for material excavated from the borrow area and placed on the dike between the neatline and the allowed construction tolerances.[4] Plaintiff asserts that because the contract bases payment on the quantity of material excavated from the borrow area rather than on the quantity placed on the embankment, and because the government allowed construction tolerances during performance, it should be paid for material excavated and placed on the dike within the allowed tolerances. Plaintiff's argument, however, ignores the clear language of the contract.

The contract indicates that payment for excavation from the borrow would be made only for the excavation required to construct the embankment to the neatline. Section 2.2.2(b) provides that "payment shall be made of only such quantities as are required for the dike embankments . . . ." (PX–2, Supplemental Notice No. 1.) In specifying the required dimensions, Section 2.2.3(a) provides that "dike embankments shall be constructed to top widths and side slopes as shown on the drawings, or as directed to lines, grades and slopes required to meet field conditions . . . ." (PX–2, Supplemental Notice No. 1.) Neither the contract specifications nor the drawings establish tolerances for the top or slope of the embankment. Therefore, absent a government directive to build the embankment to dimensions other than those delineated, the contract documents indicate that the parties intended to base payment on the amount of excavation re-

4. The neatline is defined as the top width and side slope of the embankment as delineated on the contract drawings.

quired to raise the embankment to the neatline.[5]

Plaintiff argues that because it is physically impossible to construct a dike embankment with zero tolerances, it was reasonable to assume that payment would be made for material placed within any subsequently granted tolerances. Plaintiff's argument misses the mark. Although it may not be possible to build to a zero tolerance, *compensation* can be based on any parameter the parties choose. Here, the parties agreed in the contract to base payment on construction to the neatline. By granting a tolerance for the top and slope of the embankment during performance, the government altered neither the required dimensions of the embankment nor the basis for payment. Rather, the government's action merely reduced the amount of trimming plaintiff would have had to perform if it had been required to construct the embankment as close to the neatline as possible. Indeed, plaintiff acknowledges that the tolerances did not constitute a change order. (Plaintiff's Principal Brief at 21–22.) Accordingly, Sections 2.2.2(b) and 2.2.3(a) of the contract do not support the additional payment plaintiff seeks.

### CONCLUSION

For the foregoing reasons, this court denies both plaintiff's differing site and additional payment claims. The Clerk shall dismiss the complaint. No costs shall be charged.

---

[5]. Plaintiff's conduct prior to entering into the contract further supports this conclusion. In preparing its bid, plaintiff computed the total estimated pay yardage under the contract using the same basic methods employed by the government. Plaintiff thereby based its initial pay estimate on construction to the neatline. (Tr. at 328–30, 519–20.)