The LATHAN COMPANY,
INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 64–89 C.

United States Claims Court.

April 10, 1990.

Russell S. Gill, Biloxi, Miss., for plaintiff.

Charles D. Stodghill, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

The Lathan Company (plaintiff or Lathan) and NASA entered into a $598,000.00 contract in 1987 for the removal and repair of roofing on a building at the Kennedy Space Center in Florida. During performance, plaintiff discovered thicker roofs than it had expected. Plaintiff maintained that this discrepancy constituted a differing site condition and requested an equitable adjustment. The Contracting Officer (CO) refused this request.

Several months into performance, the roof began to leak during repairs. Concerned about damage to sensitive equipment, NASA rescheduled much of plaintiff's removal and repair operation.

Upon completion of the contract in March 1988, plaintiff filed an equitable adjustment claim. Plaintiff contended that differing site conditions and NASA's control of performance caused additional expense. The CO awarded only a fraction of plaintiff's claim. Lathan subsequently filed an action in this court on February 2, 1989. Plaintiff seeks recovery of $560,-050.00 above and beyond the contract price on the same grounds asserted to the CO. The Government has counterclaimed for $117,797.00.

On October 27, 1989, plaintiff filed a motion for summary judgment or for partial summary judgment on the issues of liability. Genuine issues of material fact require this court to deny plaintiff's motion. This court has scheduled a trial for September 10–13, 1990.

## FACTS

In the fall of 1986, NASA solicited bids for the repair and replacement of seven different sections of roofing on the Vehicle Assembly Building (VAB) at the Kennedy Space Center. The VAB houses flight equipment for the space shuttle.

NASA afforded all prospective contractors the opportunity for pre-bid inspection of the job site. During pre-bid site inspection, several interested bidders asked whether NASA would permit them to cut samples of the roof. A sample is the only sure way to ascertain the composition and thickness of a roof. NASA replied that prospective contractors must submit all such requests in writing.

No prospective contractor ever wrote to NASA to obtain a sample of the roof. However, bidders asked other questions about the composition and thickness of the roof to ascertain the time and expense of removal. NASA advised bidders that the job site consisted of a "built-up" roof on a concrete deck with approximately 3 inches of insulation. NASA further explained that the insulation was wet and that the Government had resaturated the roof in 1974.[1] NASA, however, did not give specific thickness measurements.

1. Resaturation involves removing loose rock or gravel from the roof, applying additional oil resaturant, and adding more gravel. *See* Plaintiff's Proposed Findings of Uncontroverted Fact, filed Oct. 27, 1989 (Pl.Find.), at ¶ 12; Defen-

A standard built-up roof consists of three or four layers of roof felt set in hot asphalt, a flood coat of asphalt, and a rock or gravel surface. "Double-poured" roofs, on the other hand, contain two flood coats of asphalt and rock or gravel. Plaintiff's Proposed Findings of Uncontroverted Fact, filed Oct. 27, 1989 (Pl. Find.), at ¶¶ 11, 15; Defendant's Statement of Genuine Issues, filed Dec. 6, 1989 (Def. State.), at ¶¶ 11, 15. A double-poured roof is, therefore, much thicker than a standard built-up roof.

On April 3, 1987, NASA awarded the re-roofing contract to plaintiff. NASA issued a notice to proceed on April 21, 1987. By June 17, plaintiff advised NASA that the VAB roof was considerably thicker than expected. Plaintiff contended that this discrepancy constituted a differing site condition and therefore requested an equitable adjustment of the contract price. The CO denied this claim on July 16, 1987.

During the early phase of performance, NASA discovered that sections of the VAB roof leaked during repair work. This leakage jeopardized valuable flight hardware. Consequently, in August 1987, NASA ordered a resequencing of plaintiff's contemplated performance. Specifically, NASA prohibited Lathan from starting work on a new section of the VAB roof until completion of the section already underway.

Concerned about delays, the CO issued a notice to cure in November 1987. NASA demanded assurances that plaintiff would alleviate a series of problems. The CO issued a second cure notice on December 10, 1987. The CO informed plaintiff that the Government would seek recovery of any additional costs resulting from delay, defects in performance, and damage to NASA equipment.

After several meetings, plaintiff agreed to implement additional changes in its method of performance. In return, NASA agreed not to terminate the contract for default.

dant's Statement of Genuine Issues, filed Dec. 6, 1989 (Def.State.), at ¶ 12.

In March 1988, plaintiff substantially completed performance. Thereafter, on March 25, plaintiff filed with the CO a certified claim for an equitable adjustment in the amount of $461,864.43. Plaintiff later amended its claim to reflect an equitable adjustment request of $560,050.00. Plaintiff based its claim on differing site conditions. Further, plaintiff claimed that NASA's resequencing orders changed the contract.

The Government subsequently filed a counterclaim for $122,545.00. The Government contended that plaintiff breached its contractual obligation to protect NASA equipment, prevent leakage during repair, and complete the job on time.

On September 13, 1988, the CO issued a final decision. Plaintiff received $128,288.00. The CO awarded NASA $30,000.00 on its counterclaim. The CO set off NASA's award against plaintiff's equitable adjustment. Thus, NASA paid plaintiff $98,288.00 over and above the contract price.

Plaintiff filed this action with the United States Claims Court on February 2, 1989. Plaintiff claims relief under the differing site conditions clause of the contract.[2] Plaintiff further seeks recovery on the grounds that the resequencing of work by NASA either hindered performance or constructively changed the contract.

## DISCUSSION

This court may grant summary judgment where there is no genuine issue as to any material fact and the movant is entitled to judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Sweats Fashions v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). The court uses summary judgment to avoid unnecessary litigation and wasteful use of judicial resources. *Barmag Barmer Maschinenfabrik AG v. Murata Mach. Ltd.*, 731 F.2d 831, 835 (Fed. Cir.1984).

2. The differing site conditions clause in the contract at issue mirrors the standard language prescribed by the Federal Acquisition Regulations. 48 C.F.R. § 52.233–2 (1988).

When deciding whether summary judgment is appropriate, this court resolves factual disputes against the movant. *Mingus Constructors v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). However, bald assertions and speculation do not create an evidentiary conflict sufficient to defeat a summary judgment motion. *Barmag*, 731 F.2d at 836.

### Conclusiveness of Contracting Officer's Decision

To support its summary judgment motion, plaintiff relies on the final decision of the CO. *See* Plaintiff's Motion for Summary Judgment, filed Oct. 27, 1989 (Pl.Mot.), Exhibit (Ex.) 2. The CO held "that a condition differing from the Contractor's claimed expectation existed. Further, that the condition caused an increase in the Contractor's anticipated cost." Pl.Mot., Ex. 2, at 4. The decision further stated: "I find that the Contracting Officer's sequencing of the work caused increased cost in some aspects of the work. Said sequencing in effect involved limiting the amount of roofing which could be removed." Pl.Mot., Ex. 2, at 4.

■ This court is not bound by either the findings of fact or the conclusions of the CO. The Contract Disputes Act of 1978 provides:

The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. The decisions shall state the reasons for the decision reached, and shall inform the contractor of his rights.... Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding.

41 U.S.C. § 605(a) (1982). The Act further declares that the Claims Court shall proceed *de novo* on claims arising from a CO's decision:

Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.

....

Any action under paragraph (1) or (2) shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court.

41 U.S.C. § 609(a)(1), (3) (1982).

The United States Court of Appeals for the Federal Circuit's interpretation of the Contract Disputes Act underscored the plain meaning of §§ 603 and 609:

[T]he Disputes Act itself suggests that, where an appeal is taken to a board or court, the contracting officer's award is not to be treated as if it were the unappealed determination of a lower tribunal which is owed special deference or acceptance on appeal.

*Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed.Cir.1987).

■ This court may weigh the CO's findings and conclusions as it would any other evidence. However, the CO's decision on NASA's liability does not alone support a summary judgment motion. Rather, plaintiff must show independently the absence of any genuine issues of material fact.

### Differing Site Conditions

Under the parties' agreement, NASA must adjust the contract price for additional cost incurred by the contractor as a result of site conditions which differed from those contemplated under the contract. The applicable contractual provisions state:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inher-

ing in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

*See* 48 C.F.R. § 52.236–2(a), (b) (1988).

The differing site conditions clause insulates a contractor from the costs of unforseen circumstances and prevents inflated bidding. *Erickson–Shaver Contracting Corp. v. United States*, 9 Cl.Ct. 302, 304 (1985), citing *Kaiser Industries Corp. v. United States*, 169 Ct.Cl. 310, 340 F.2d 322 (1965).

As this clause suggests, plaintiff may obtain an equitable adjustment for two categories of differing site conditions. Plaintiff and NASA genuinely dispute facts about both categories of differing site conditions. Consequently, this court cannot grant summary judgment on the issue of NASA's liability.

## Type I Differing Site Conditions Claim

■ NASA must compensate plaintiff for latent or subsurface conditions that are materially different from the provisions of the contract (Type I claim). Thus, this court must determine "whether the contractor could reasonably have anticipated the conditions encountered from a knowledgeable interpretation of the contract documents...." *Erickson–Shaver*, 9 Cl.Ct. at 304.

■ To prevail on a Type I claim, plaintiff must show that the contract at issue made representations about the condition of the roofs and that such a condition in fact did not exist. The Federal Circuit stated: "A contractor cannot be eligible for

an equitable adjustment for changed conditions unless the contract indicated what those conditions would supposedly be." *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). This court's predecessor, the Court of Claims, similarly explained that "[a] changed conditions claim ... is entirely dependent on what is 'indicated' in the contents of the contracts documents." *Foster Constr. v. United States*, 193 Ct.Cl. 587, 603, 435 F.2d 873, 881 (1970).

■ If the contract at issue is silent on the conditions of the site, plaintiff has no Type I claim. *Foster Constr.*, 435 F.2d at 881; *S.T.G. Constr. Co. v. United States*, 157 Ct.Cl. 409, 415 (1962). The Court of Claims explained:

[I]nsofar as subsurface or latent conditions are concerned, there must be reasonably plain or positive indications in the bid information or contract documents that such subsurface conditions would be otherwise than actually found in contract performance....

*Pacific Alaska Contractors v. United States*, 193 Ct.Cl. 850, 864, 436 F.2d 461, 469 (1971).

This court cannot grant summary judgment on plaintiff's Type I claim. The parties have a genuine dispute about what conditions the contract disclosed. While agreeing that the contract envisioned removal of a built-up roof, the parties disagree about the meaning of the term "built-up." This court will need to hear expert testimony to determine the meaning of this term.[3]

According to plaintiff, the contract required removal of a standard, built-up roof. Brief of Plaintiff in Support of Motion for Summary Judgment, filed Oct. 27, 1989 (Pl.Br.), at 5. Specifically, plaintiff relied on the information provided by the following pre-bid question and answer, which became part of the contract documents:

---

**3.** The court acknowledges that what the contract indicates is a question of law. To reach this question as to the term "built-up roof" the court must determine how such term is used in

the roofing industry. The court must rely on expert testimony to understand industry custom or practice.

Q: Have "Roof Plugs" been taken to determine the existing thickness of material and are these calculations available to us? If so, what is the existing thickness of plugged material?

A: Roof plugs were taken. Roof consists of approx 3″ of insulation board on aggregate surfaced built-up roof on a concrete structural deck. The existing insulation is wet and roof was resaturated in 1974.

Pl.Br., Appendix (App.), Exhibit No. 1.

Plaintiff's experts contend that a built-up roof would measure from ½ to ⅝ of an inch thick. Pl.Find., at ¶¶ 10, 11. Plaintiff further asserts that the resaturation process employed in 1974 added negligible thickness to the roof. Pl.Find., at ¶ 13. At oral argument, plaintiff indicated that it gained this understanding of resaturation through the 1974 specifications.[4]

Defendant contends that the contract was silent on the thickness of the roof. Relying on the deposition of John Knight, NASA's lead design engineer, defendant contends that NASA merely provided enough information so that bidders could calculate the thickness of the roof on their own. Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment, filed Dec. 6, 1989 (Def.Br.), at 13, Appendix (App.), at 240.

Even assuming that the contract documents imply a thickness, defendant disputes plaintiff's figures on the standard thickness of a built-up roof. Defendant presents expert testimony to show that the thickness of a standard built-up roof can range from ⅞ inch to 1⅛ inches. Def. State., at ¶ 11. These figures are ¼ to ½ inch greater than the standard thickness suggested by plaintiff.

Further, defendant contends that the contract prepared bidders to expect a thickness of 1½ to 2⅛ inches because of the

resaturation process completed in 1974. *See* Def.State., at ¶¶ 10, 11, 13, 16. The bid documents disclosed this resaturation. Defendant explains that "[a] typical built-up, resaturated roof can be this thick, depending on the amount of gravel applied during the resaturation process." Def. State., at ¶ 16. Thus, contrary to plaintiff, defendant argues either that the contract documents are silent on thickness, or that a reasonable bidder should have contemplated a roof which exceeds a thickness of ⅝ inch. At trial, this court will determine the meaning of the terms "built-up roof" and "resaturation." The parties genuinely dispute these terms on this motion. Expert testimony will provide the court a factual basis for determining the meaning of these disputed terms.

Plaintiff and defendant also disagree about the conditions actually encountered at the site. Plaintiff contends that the roofs were between 1½ and 2½ inches thick. Pl.Br., at 6. Defendant contends, however, that the thickness of the roof ranged from ½ inch to 2 inches, with very few portions of the roof having a thickness greater than 1¼ inches. Def.Br., App., at 53–57 (affidavits of Greg Stephens and Herbert Jones, construction monitors hired by NASA for Lathan job site). Plaintiff further contends that the documents supplied by NASA did not accurately represent the job site. Specifically, Lathan asserted at oral argument that the roof was, in fact, double-poured, not built-up.[5] At trial, this court will determine the actual thickness of the roof removed by plaintiff.

In sum, defendant's contentions create a dispute of fact about existence of a Type I differing site condition. Thus, this court may not grant plaintiff summary judgment on this issue.

**Type II Differing Site Conditions Claim**

 NASA must compensate plaintiff for unusual physical conditions that materi-

---

4. Defendant maintains, however, that the 1974 documents were not necessarily as-built specifications. Consequently, they may not represent accurately the actual thickness added by resaturation.

5. Plaintiff points to a report of one of the NASA roofing experts which suggests that the VAB

roof was actually double-poured. Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment, filed Dec. 6, 1989 (Def.Br.) App., at 38. Defendant contends through expert testimony, however, that the contract documents properly described the roof as built-up. Def.Br., App., at 3–4.

**128**

ally differ from those ordinarily encountered in similar contractual work (Type II claim). The Claims Court explained:

> In the second situation (Type II), an equitable adjustment will be granted where the contractor encounters unusual physical conditions differing materially from those ordinarily encountered and generally recognized as inhering in the work of the character provided for in the contract.

*Erickson–Shaver,* 9 Cl.Ct. at 304.

■ A Type II claim requires plaintiff to show three elements. First, plaintiff must show that it did not know about the physical condition. Second, plaintiff must show that it could not have anticipated the condition from inspection or general experience. Third, plaintiff must show that the condition varied from the norm in similar contracting work. *Perini Corp. v. United States,* 180 Ct.Cl. 768, 780, 381 F.2d 403, 410 (1967); *S.T.G. Corp.,* 157 Ct.Cl. at 415.

Plaintiff contends that it had no knowledge of or reason to expect a double-poured roof at NASA's facility. Moreover, according to plaintiff, the thickness of this double-poured roof varied drastically from a built-up roof.

Defendant disputes plaintiff's contention that the site conditions were unusual for a built-up roof. Specifically, defendant states:

> The fact that the thickness of a roof ranges from 1 to 2½ inches does not necessarily mean that it is "double-poured" [rather than built-up]. A typical built-up, resaturated roof can be this thick, depending upon the amount of gravel applied during the resaturation process.

Def. State., at ¶ 16.

This disagreement involves the linchpin of a Type II claim. In light of this dispute, the court may not grant plaintiff summary judgment on this issue.

*NASA Resequencing of Plaintiff's Work*

Both parties agree that NASA directed some of plaintiff's performance under the contract. NASA gave plaintiff written and verbal instructions on the sequence and manner of plaintiff's performance. The parties do not agree, however, that NASA's role constructively changed and delayed the contract.

Constructive Change

■ A constructive change generally arises where the Government, without more, expressly or impliedly orders the contractor to perform work that is not specified in the contract documents. *Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 525, 455 F.2d 1037, 1050 (1972). The Court of Claims explained:

> [W]here a contract contains the standard 'changes' provision and the contracting officer, without issuing a formal change order, requires the contractor to perform work ... which the contractor regards as being beyond the requirements of the pertinent specifications ... the contractor may elect to treat the contracting officer's directive as a constructive change order and prosecute a claim for an equitable adjustment....

*Ets–Hokin Corp. v. United States,* 190 Ct.Cl. 668, 674, 420 F.2d 716, 720 (1970). However, the Government may, without liability, merely direct the contractor to perform in accordance with the terms of the contract. *H.L.C. & Assoc. v. United States,* 176 Ct.Cl. 285, 307, 367 F.2d 586, 599 (1966).

In its motion for summary judgment, plaintiff asserts that a constructive change occurred simply because NASA directed performance. As the Court of Claims explained, however, NASA must have done more than direct or instruct plaintiff; NASA also must have required performance which departs from the terms of the contract. Plaintiff has not yet made that showing.

Further, defendant maintains that NASA's actions did not constitute a constructive change. Defendant contends that NASA merely supervised and directed plaintiff to improve performance and to ensure completion of the contract. Thus, this court cannot summarily find defendant liable for a constructive change.

Equitable Adjustment for Delay

▆▆▆ Every contract with the Government contains an implied obligation that neither party will do anything to prevent, hinder, or delay performance. *Lewis–Nicholson, Inc. v. United States,* 213 Ct.Cl. 192, 204, 550 F.2d 26, 32 (1977). Similarly, the Government breaches its implied obligation when delay occurs because of excessive supervision or control over the contractor. *Roberts v. United States,* 174 Ct.Cl. 940, 357 F.2d 938 (1966). Thus, where the Government's actions delay performance, and thereby increase costs, the contractor has a claim for damages. *Lewis–Nicholson,* 550 F.2d at 26.

▆▆▆ For the same reasons that this court cannot grant plaintiff summary judgment on the constructive change issue, it also cannot find that defendant delayed or hindered performance. Specifically, the parties dispute whether NASA or the contractor caused delays. Contrary to plaintiff, defendant contends that NASA had to oversee and direct performance to ensure that plaintiff completed the job. Def.Br., at 18. The CO's final decision aptly summarizes the Government's position:

> [T]he Government asserts that most of the contractor's increased cost and time were caused by the contractor's own inefficiencies such as: inadequate management, inadequate job-site supervision, poor quality of workmanship, excessive turn-over of personnel, labor problems, badging of personnel, equipment breakdowns, and lack of adequate material.

Pl.Br., App., Ex. 2, at 3. *See also,* Def.Br., App., at 199–203 (deposition of Robert Barnini). Such disagreement about material issues of fact precludes summary judgment.

## CONCLUSION

Plaintiff claims an equitable adjustment because it encountered differing site conditions, because NASA constructively changed the contract, and because NASA delayed or hindered performance. Plaintiff has presented a substantial body of evidence to support its claims. At least in this stage of the proceedings, however, the weight and quantum of plaintiff's evidence is not dispositive of the issues. Rather, the proper inquiry is whether the parties dispute material issues.

NASA has contradicted plaintiff's factual assertions sufficiently to make judgment for plaintiff impossible at this juncture. Consequently, this court must deny plaintiff's motion for summary judgment. It is further ordered:

1. The parties shall submit Appendix G materials on or before Thursday, August 30, 1990.

2. The pre-trial conference shall be held on Tuesday, September 4, 1990, at 10 a.m. in the National Courts Building, 717 Madison Place, N.W., Washington, D.C. Plaintiff shall notify my law clerk (202) 633–7255 if he wishes to participate by telephone conference call. The conference call will be placed by the court.

3. The trial in this case shall be held from September 10–13, 1990, at 9 a.m. in Mobile, Alabama. The court will notify counsel of the exact location for trial as soon as that information is available.