**SIPCO SERVICES & MARINE INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 92–604C.

United States Court of Federal Claims.

April 17, 1998.

Nicholas S. Papleacos, Atlanta, GA, for Plaintiff.

Elizabeth A. Rinaldo, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen, Director, and Anthony H. Anikeeff, Assistant Director. Kevin Kouba, National Aeronautics and Space Administration, Moffett Field, CA, of counsel.

## OPINION

ROBINSON, Senior Judge:

This action is brought pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 601, *et seq.* (1988). Plaintiff seeks conversion of the government's termination for default to a termination for convenience of a government contract and an equitable adjustment of the contract price as well as damages due to governmental delay and interference with plaintiff's performance. The Amended Claim presented at trial seeks monies for these claims totaling $2,296,060.38 plus interest and attorneys' fees and costs. Immediately prior to commencement of trial, the court participated in a comprehensive site visit which included most of the areas covered by the contract. Trial was held in San Jose, California from May 27–30, 1997, in San Francisco, California from June 2–6, 1997 and in Washington, D.C. from July 21–24, 1997. Oral argument on post-trial filings was held in Washington, D.C. on February 4, 1998. The court provided the parties with a draft opinion and offered the parties the opportunity to direct the court to possible factual and typographical errors. The court has carefully reviewed the parties' submissions. For the reasons which follow, the court finds that plaintiff is entitled to recover upon its claims.

### Background

Plaintiff, SIPCO Services & Marine, Inc. ("SIPCO"), is a Texas corporation. In the course of its business, SIPCO performs coating removal and replacement for the commercial and industrial construction industry. Prior to this project, SIPCO had experience in performing lead abatement and coatings work whereby existing coatings, with lead in either the primer or the top coat, were removed before recoating occurred. On May 3, 1990, plaintiff entered into Contract No. NAS2 13209 with the National Aeronautics & Space Administration ("NASA") for the removal of coatings containing lead and their replacement on portions of the exterior of a wind tunnel at the Ames Research Center

("Ames") at Moffett Field, California. Ames' primary activity in the early 1990s pertained to aeronautical research achieved primarily through the operation and maintenance of ten major wind tunnel facilities. Each of these wind tunnels is unique with respect to size and research capability, and there is demand for use of these facilities from both military and commercial sources. Consistent, safe operation and maintenance of the wind tunnels is, therefore, imperative to Ames and the national interest.

The contract in dispute involved surface preparation and application of coatings to the surface of the exterior steel structure of the wind tunnel identified as the "40 × 80" wind tunnel. Such designation relates to the tunnel's dimensions of 40 feet in height and 80 feet in width. The wind tunnel can accommodate full-size military and commercial aircraft. For the purpose of designating which parts of the structure were to be coated under the contract, the steel structure of the wind tunnel was divided into 13 "areas." SIPCO was to recoat areas 1, 2, 3, 10, and 13.[1] When the project's specifications were being developed, NASA determined, in view of data obtained from a similar undertaking at NASA's Langley Research Center ("Langley"), that it was necessary to sandblast abrasively to remove all of the existing coatings using different forms of granular blasting particles and recoat the wind tunnel with a zinc-rich primer coat rather than a lead-based coating. The granular blasting particles normally used for this purpose range from various abrasives to recoverable, reusable steel grit and shot. The abrasive is loaded into a blast pot. It is then closed and pressurized with compressed air. Hoses having tipped nozzles are attached to the pots. The particles are ejected at high speed through these nozzles onto the steel surface. This process removes the existing coat, leaving behind a reconditioned steel surface of peaks and valleys. Large vacuum tanks remove debris from the surface, and after thorough cleaning, the primer and other coats are applied.

---

1. This was the first phase, or Phase I, of the overall plan to blast and recoat all 13 areas of the wind tunnel.

For the purposes of blasting and coating the wind tunnel, specifications were developed by Kenneth Kono, the Contracting Officer's Technical Representative ("COTR") for this project. The Contracting Officer ("CO") for this project was Kevin Carey,[2] who worked at Ames. After investigating various coating surfaces, Kono concluded that the appropriate surface preparation and coating for the wind tunnel would be a near-white blast and subsequent coating with an inorganic zinc primer with an acrylic topcoat. Kono concluded that specific procedures and regulations would be required in the removal of the existing paint, because the old coating was a red lead-based paint that was deemed hazardous material when removed. Specification development was completed on December 19, 1989, whereupon NASA issued Invitation For Bids ("IFB") No. 2–33642. The contract specifications set forth NASA's expectations regarding surface preparation and coating; procedures for ensuring health and safety of personnel and property; monitoring of the ambient air and sampling of soil for lead particulate matter; and government inspection of the project. The specifications also incorporated by reference provisions of the Federal Acquisition Regulations System ("FAR"); Environmental Protection Agency ("EPA"), C.F.R. Title 40; the Occupational Safety and Health Act ("OSHA"), C.F.R. Title 29; the California Hazardous Waste Management Act, Cal.Code.Regs. title 22; the California Division of Industrial Safety ("CAL/OSHA"), Cal.Code.Regs. title 8; the Bay Area Air Quality Management District ("BAAQMD") rules and regulations; and the Ames Health and Safety Manual, as amended. For the purposes of this case, the three provisions of greater importance are BAAQMD, OSHA, and Cal/OSHA.

A pre-bid conference was held on-site on January 10, 1990. Among those present at the conference were Carey and Kono from NASA, Roy Brock, President of SIPCO, and David Walton, who would later serve as SIPCO's Project Manager. The contract contained two provisions regarding oral communications prior to the award of the contract. The first is found under the section labeled *"INSTRUCTIONS, CONDITIONS, AND NOTICES,"* where point number 9 cited to FAR 52.214–6 *EXPLANATION TO PROSPECTIVE BIDDERS* (APR 1984). It states, in part, "Oral explanations or instructions given before the award of a contract will not be binding. . . ." Def.'s Ex. 8 at 12. The second is found within the specifications under Section 01100, GENERAL REQUIREMENTS, which speaks to the pre-bid conference directly. It states:

> Before the bid date, a Pre–Bid Conference for the project will be conducted by the Contracting Officer. The object of the Pre–Bid Conference is to acquaint bidders with existing facilities. *The conditions and requirements of the plans and specifications shall govern any information presented at the Pre–Bid Conference, unless amended in writing by the Contracting Officer.*

Def. Ex. 8 at 54–55 (emphasis added). Further, there was no notice in the bid documents that attendance at the pre-bid conference was a mandatory prerequisite for bidding upon or being awarded the contract. However, plaintiff was represented at the pre-bid conference.

Two issues of later crucial consequence were raised at the conference. The first issue involved the so-called inaccessible areas, which refer to various covered areas and back-to-back angles in the steel structure which are so close together that it would have been impossible for any painting contractor, no matter how experienced, to blast to the near-white standard envisioned by NASA and then apply the specified paint system. During the pre-bid site visit, SIPCO had noted these areas. Thus, SIPCO questioned the handling of these areas at the pre-bid conference. In response, NASA told bidders at the conference to bid the specifications as they presently existed. This meant that NASA was requiring blasting to a near-white standard everywhere, including the in-

---

**2.** The parties made much of the relative lack of experience in lead abatement projects possessed by the principal players in this dispute. Suffice it to say, in the early 1990s when this contract was being performed, the science of lead abatement was in its infancy. Undoubtedly, this led to general inexperience on both sides.

accessible areas. even though this standard was obviously not physically possible to achieve. Therefore, in its bid, SIPCO did not include monies for preparation and coating of these inaccessible areas, recognizing the fact that using available equipment it could not blast and coat to specification requirements. Kono was thus made aware of the problem of the inaccessible areas but NASA made no related changes in the specifications.

The second issue raised at the conference involved monitoring of the ambient air around the job site for emissions of lead. The BAAQMD regulations contain strict restrictions on the levels of lead that can be safely emitted from a site. To test properly that lead emissions are within a legal standard of 1.0 micrograms per cubic meter ("1.0 standard"), high volume monitors are placed at a site's property line and left to monitor the air for a period of 24 hours. Sometimes, the results are averaged over a 30–day period. But crucially, the 1.0 standard of BAAQMD only has legal substance if the monitoring is done at the property line and over a 24–hour period. During the conference, Kono told the bidders that air monitoring would be performed around the facility. SIPCO contends that during the conference Kono said nothing concerning the specific locations where air monitors were to be placed, and application of the BAAQMD 1.0 standard in the immediate vicinity of the facility. NASA replies that Kono informed bidders that air monitoring would be performed in the immediate vicinity of the facility using a 1.0 standard. At post-trial oral argument, government counsel argued that a 1.0 standard was to be used near the containment zones, but that it was not to be the BAAQMD standard because the monitors would be placed near containment zones and operated only during blast cleaning operations and thus in contravention of the BAAQMD regulations. There is no written record of Kono's statements at the pre-bid conference to assist the court in resolving this factual dispute. However, the court accepts as true SIPCO's representations concerning Kono's statements at the pre-bid conference; the court finds Kono's testimony to the contrary as not credible.

NASA received seven bids in response to its IFB. These bids were opened on February 14, 1990. SIPCO was awarded the contract on May 3, 1990, and issued the Notice to Proceed ("NTP") on May 24, 1990. The contract provided that the work, which included removal and disposal of the lead-based paint as hazardous waste material, was to be performed within 240 days of the issuance of the NTP-by January 18, 1991–in consideration for $2,370,152 payable, in part, through periodic progress payments.

The contract incorporated the contract specifications as well as several FAR provisions, in addition to the specifications and provisions noted earlier. In addition to the Changes Clause, 48 C.F.R. § 52.243–4 (AUG 1987), another FAR provision factors into the court's resolution of this dispute. It is:

18–52.223–70 *SAFETY AND HEALTH* (DEC 1988)

(a) The Contractor shall take all reasonable safety and health measures in performing under this contract and shall, to the extent set forth in the contract Schedule, submit a safety plan and a health plan for the Contracting Officer's approval. The Contractor shall comply with all Federal, State, and local laws applicable to safety and health in effect on the date of this contract and with the safety and health standards, specifications, reporting requirements, and provisions as set forth in the contract Schedule.

(b) *The Contractor shall take or cause to be taken any other safety and health measures the Contracting Officer may reasonably direct. To the extent that the Contractor may be entitled to an equitable adjustment for those measures under the terms and conditions of this contract, the equitable adjustments shall be determined pursuant to the procedures of the changes clause of this contract;* provided, that no adjustment shall be made under this Safety and Health clause for any change for which an equitable adjustment is expressly provided under any other provision of this contract.

. . . .

(f) *Authorized Government representatives of the Contracting Officer shall have access to and the right to examine the sites or areas where work under this contract is being performed in order to determine the adequacy of the Contractor's safety and health measures under this clause.*

Def.'s Ex. 8 at 38–39 (emphasis added).

The following provisions are found in the contract specifications which begin at Defendant's Exhibit 8, p. 48:

## Section 01100 GENERAL REQUIREMENTS

### 1.1 SCOPE OF WORK

. . . .

The Government will conduct an on-site Pre–Bid Conference.... The Government *recommends* all interested bidders to attend this meeting.

. . . .

*Contractor shall be responsible for the removal, containment, on-site handling, and the disposal of the red lead hazardous waste.*

. . . .

The Contractor shall provide a full-time Project Manager at the work site for the duration of this contract. *The Project Manager shall have the authority to negotiate change orders, coordinate work, and make other decisions pertaining to the fulfillment of their contract.*

Def.'s Ex. 8 at 51 (emphasis added).

### 1.6 SCHEDULE

. . . .

Base Bid shall be completed within 240 calendar days from the date of "Notice to Proceed."

Def.'s Ex. 8 at 53.

### 1.7 EXISTING FACILITIES

. . . .

The Contractor shall provide protection to ensure that Government, and personal property such as vehicles, equipment, facilities, windows, etc. are not exposed to damage. Damage to property resulting from the Contractor's operation shall be repaired to its original condition at no cost to the owner.

Def.'s Ex. 8 at 54.

## SECTION 01150 SUBMITTALS

. . . .

### 1.2 SUBMITTALS

. . . .

SD–60. Safety Plan

. . . .

The Safety Plan shall include, as a minimum, the following:

. . . .

Procedures for the safe handling of hazardous materials from both a health and an environmental standpoint, complying with OSHA, CAL/OSHA, Environmental Protection Agency (EPA), California Department of Health Services (CDHS), Bay Area Air Quality Management District (BAAQMD), and the Ames Health and Safety Manual regulations.... *The Contractor shall submit in writing a detailed containment plan and rigging plan as part of this Safety Plan ....* The Contractor is advised that *the Government will sample soils at the job site before the start of work and after completion of the work and analyze them for lead content* using atomic absorption techniques. *Appreciable increases in lead content will not be accepted.... The Government will also monitor the ambient air with high volume air sampling during blast cleaning operations.* Total suspended particulate including lead ... will be collected on removable filters and analyzed daily *to ensure compliance with environmental requirements.*

Def.'s Ex. 8 at 63–64 (emphasis added).

## SECTION 1300 SAFETY PROVISIONS

. . . .

### 2.1 SAFETY, HEALTH AND ENVIRONMENTAL REQUIREMENTS

The Contractor shall perform all work in accordance with the approved Safety Plan (SD–60).

. . . .

*The Government will monitor the ambient air with high volume air sampling during blast cleaning operations.* Total suspend-

ed particulate including lead will be collected on removable filters and analyzed daily *to ensure compliance with environmental requirements.*[3]

Def.'s Ex. 8 at 70 (emphasis added).

SECTION 09800 COATING SYSTEM

. . . .

3.2 SURFACE PREPARATION, GENERAL

. . . .

*The Contractor is responsible for containing dust emissions within the legal level, and that level shall not create a personnel safety or environmental hazard.* Ambient air monitoring with high volume samplers will be performed by the Government during blast cleaning operations.

Def.'s Ex. 8 at 83–84 (emphasis added).

3.4 COATING APPLICATION

. . . .

Protective coverings or drop cloths shall be used to protect floors, fixtures, equipment, prepared surfaces and applied coatings.

. . . .

Under no circumstances shall coatings be applied during inclement weather or when such weather is imminent. Surfaces to be coated shall be a minimum of five degrees Fahrenheit above dew point and not falling. Coatings shall not applied when the relative humidity exceeds 85 percent.

Def.'s Ex. 8 at 84–85.

The contract specifications do not state NASA will hold SIPCO to the BAAQMD or any other 1.0 standard at or near the containment zone. The documents require SIPCO to comply with the stated laws and regulations, of which BAAQMD is one. BAAQMD rules require application of the 1.0 standard at the property line. There is no specification which either explicitly states or by reasonable interpretation places a reasonably prudent contractor on any conceivable notice that the 1.0 standard will apply within the work area or at or even near the containment zone. Further, there is no specification mandating 100% containment of all lead emissions on the project. Rather, the only specification on the subject requires the con-

tractor to keep lead emissions within the "legal level." Additionally, there was no requirement in the specifications for any kind of air movement within the containment itself, nor was there any direction in the specifications to contractors to provide for air movement data in conjunction with their safety submissions.

Prior to being awarded the contract on May 3, 1990, SIPCO wrote a letter to NASA directed to Ken Kono's attention dated April 16, 1990, detailing its plan for safety and containment on the project. In the letter, SIPCO's Safety Director Richard McGinty states:

Each area being addressed will be roped off with safety ribbon and tagged clarifying that these operations are in progress. During this operation, we will suspend tarps and netting. These apparatuses will enable us to control and contain airborne contaminants. . . . Dust collection within these enclosures will be maintained by the means of suction fans.

. . . .

In areas where bare ground is exposed, we will address these areas by covering them with polyethylene film, taking special care to ensure any and all openings or overlaps are sealed. These areas will then be overlaid with plywood.

Def.'s Ex. 18 at 1.

NASA, however, felt that this submission lacked detail. In a May 25, 1990 MEMORANDUM FOR RECORD sent by Kono to Carey, Kono described a May 23, 1990 meeting between relevant SIPCO and NASA personnel. Kono related that NASA wanted more details concerning the containment material and method. He wrote, "NASA is interested in the . . . number of air exchanges within the containment. . . ." Jt. Ex. 7 at 2. Kono then stated, "Many of these questions were answered at this meeting, however, I requested that this information be formally submitted." Jt. Ex. 7 at 2. Additionally, this memorandum references a May 14, 1990 letter from SIPCO concerning the inaccessible areas. Kono wrote, "NASA does recognize that inaccessible areas do ex-

---

**3.** This clause is to be read in *pari materia* with air quality standards that are specific.

ist (back to back angles, guest plates adjacent to the transite siding, etc.). NASA has agreed to work with SIPCO in developing an alternate system that may improve the protection of these areas." Jt. Ex. 7 at 2. This correspondence is notable for what it does not contain, i.e., any reference to any requirement or expectation that SIPCO provide 100% containment.

SIPCO responded in a June 8, 1990 letter to Kono from Ernie Watson, Vice President of SIPCO. Jt. Ex. 9. Under a section headed *"Containment Plan,"* Watson wrote, "The containment material shall be a tightly-woven synthetic mesh.... The bottom will be sealed to the protective ground covering by lapping underneath the covering and securing it to the cover." Jt. Ex. 9 at 4. Watson also wrote, "Our negative containment pressure will be achieved using our 18,000 CFM dust collector. We anticipate one complete air change every five minutes, or 12 changes per hour." Jt. Ex. 9 at 5.

As previously indicated, the NTP was issued on May 24, 1990. From that date until July 8, 1990, SIPCO mobilized at the project site. David Walton was SIPCO's project manager. As project manager, the contract required that Walton "shall have the authority to negotiate change orders, coordinate work, and make other decisions pertaining to the fulfillment of their contract." Def.'s Ex. 8 at 51 (Section 01100 GENERAL REQUIREMENTS, 1.1 Scope of Work). On July 9–10, 1990, SIPCO conducted testing of its blasting equipment and of the sufficiency of its containment. NASA personnel observed these tests. On July 10, 1990, SIPCO commenced production blasting operations. From virtually this point on, the project was beset with various unanticipated delays that extended its completion well beyond the original completion date of January 18, 1991.

The issue of the inaccessible areas negatively impacted SIPCO's performance of the contract. In a May 14, 1990 letter to Kono, Walton wrote:

> The structure is configured such that it has inaccessible areas for both blasting and coating and other locations that are blastable by the ricochet method, but not accessible for painting except by "flooding" or brush and roll (finger rollers).
>
> Inorganic Zinc is susceptible to mud cracking and gatoring when applied at excessive mil thicknesses by any method. It will mudcrack, gator and finger when applied by roller or brush at almost any thickness. Therefore, we can only warranty that we will apply one of the specified coating systems in direct accordance with the specification, but cannot guarantee the end result due to the inherent problems with the system delineated herein.

Def.'s Ex 21.

The letter suggested the use of an approved surface tolerant epoxy, and further stated, "Our price for this change is $355,-523.00 additional for the base bid." Def.'s Ex. 21. Thus, in addition to SIPCO's inquiries at the pre-bid conference, this letter provided NASA with further notice of SIPCO's concerns about the inaccessible areas. In his May 25, 1990 letter to Carey, Kono stated that the Walton letter was acknowledged at the May 23, 1990 meeting between NASA and SIPCO personnel. Kono stated that "NASA has no intention of changing the surface preparation requirements...." Jt. Ex. 7 at 2. While stating that NASA recognized that inaccessible areas existed, it agreed "to work with SIPCO in developing an alternative system that may improve the protection of these areas." Jt. Ex. 7 at 2. In a July 9, 1990 MEMORANDUM FOR RECORD from Kono to Carey, Kono detailed the events of a July 2, 1990 meeting that included Kono and Walton. Kono wrote:

> Dave Walton suggested that using the surface tolerant epoxy may be a change in scope. I replied that the change is a relaxation of the original surface preparation requirements and this change may be considered for the benefit of the contractor in meeting the protective requirements of the specification without compromise to the quality of the system.

Jt. Ex. 10 at 2.

Despite this purported relaxation, these defective specifications were never modified by NASA. By failing to modify the specifications, the operative rules for treatment of

inaccessible areas remained the ones inadequate to meet the task. The only way for the inaccessible areas to be treated was to adopt a different coating system. In a letter to Kono dated July 14, 1990 relating to the special treatment required of the inaccessible areas, Walton discussed a July 10, 1990 meeting:

> It was decided to ... square off and apply surface tolerant epoxy ... to those areas inaccessible to spray and to use Amerlock 400 for touch-up of zinc if and when necessary.
>
> *This is a no-cost modification to the contract.*

Jt. Ex. 11 (emphasis added).

Shortly after the commencement of blasting activities, quantities of dust leaked into the wind tunnel interior. The dust intrusion was principally due to the porous nature of the transite walls of the building itself. Neither party had foreseen this occurrence, but this incident would serve as the first of many disagreements concerning the quality of the containment.

SIPCO earlier provided NASA with details about the type of containment it intended to use. Following the initial dusting of some areas within the wind tunnel, NASA began a pattern of interference with SIPCO's day-to-day job performance led by Kono. This usually involved Kono's directions to SIPCO relating to the quality and character of the containment.

In August 1990, NASA initiated the use of smoke bomb tests as a means to better determine the quality of the containment and to buttress its complaints to SIPCO. There is no provision in the contract for use of such tests to identify containment leaks. In his letter to Dave Walton dated August 28, 1990, Kono writes, "The criteria for acceptance is that *no* smoke escapes the containment area." Jt. Ex. 14. However, Kono testified that his intention was to contain the smoke, but not to hold SIPCO to 100% containment. We find this testimony not credible also. His intent was exactly the opposite—to require 100% containment.

Under the contract, SIPCO's lead abatement activities were properly subject to monitoring but only pursuant to its obligation to fulfill the requirements of various federal, state, and local laws. As stated above, the tests for safety were largely environmental in nature and can be placed into three categories: air monitoring for OSHA compliance, soil sampling, and air monitoring for compliance with BAAQMD regulations. The OSHA standards differed from the BAAQMD requirements. OSHA standards essentially require that employees not be exposed to levels of lead in the air greater than 50 micrograms per cubic meter of air. To test for the presence of airborne lead, a low volume personal air monitor is used. These monitors can be worn by an employee or placed in one location as an "area sampler." Measurements are taken over an eight-hour period.

The contract called for soil sampling to be done "at the job site before the start of work and after completion of the work," with the understanding that "appreciable increases" would not be tolerated. Although a methodology for soil sampling is not specified in the contract, plaintiff states the purpose of the testing was to determine whether lead levels in the soil increased by five parts per million. Only three soil samples were taken prior to the commencement of blasting operations on July 10, 1990.

The BAAQMD rules are a stricter, local version of the federal Clean Air Act. The purpose of the rules is to limit lead emissions coming from a piece of real property. The operative position for the BAAQMD-specified types of high volume air monitors is the property line. Further, under BAAQMD rules measurements are to be taken for periods of 24 hours, and then in some cases averaged over a period of 30 days. Thus, succinctly stated, the BAAQMD standard of compliance is that emissions from a piece of real property, when properly measured at the property line, shall not exceed 1.0 micrograms of lead per cubic meter of air. The BAAQMD regulations in no way prohibit the emission of *any* lead, but only require that such emissions may not exceed the 1.0 stan-

dard.[4]

NASA hired ChemWaste to conduct air monitoring and soil sampling. It employed Ron Colfer to perform these tasks. Colfer consistently failed to operate the air monitors in compliance with BAAQMD rules. The monitors were routinely placed in various locations inside the facility and inside and immediately outside SIPCO's work areas, many hundreds of feet distant from the site's property line. In every instance, as demonstrated to the court at trial, Colfer failed to run the air monitors for the full 24–hour period. He may never have run them for even 12 consecutive hours.

Rigging the containment zone is a labor-intensive task. SIPCO prepared its bid assuming it could contain three structural bents at a time. It was SIPCO's practice to erect scaffolding from the ground to the highest point along the side of the wind tunnel where SIPCO personnel would be working. SIPCO next draped the scaffold structure, from the top to the ground, with tarps and other containment materials including visqueen sheeting. Later, the areas were further enclosed by constructing eight foot high plywood walls at the bottom of the structure. Naturally, any reduction in the size of the containment would require a greater amount of time to be spent on assembling and disassembling the containment zones, and moving the equipment from one location to another. For example, if six bents were to be contained in groups of three, the containment zones would only have to be erected, disassembled, and moved twice, whereas containments in groups of two would require the same labor-intensive tasks to be performed on three occasions to contain the same total work area.

SIPCO's work encompassed four categories of production. First, the containment zones were assembled. Second, blasters would blast the steel beams within the containment. Third, cleaners would remove all dust and paint chip residue from blasted steel surfaces, the scaffolding, containment material, transite walls, and the ground. Finally, after checking the weather conditions, taking the outside air temperature and computing the dew point, SIPCO would, conditions permitting, apply the primer coat and remaining full coats of paint. Throughout this process the work was inspected for compliance with specifications. If necessary, reworking was performed.

As stated, SIPCO commenced its production blasting on July 10, 1990 at Area 3. During this part of the operation, the porous nature of the building's walls was discovered when dusting occurred inside the structure. SIPCO claims Kono directed it to cover equipment and furniture in the interior rooms of the structure. Clearly, SIPCO performed the internal containment work at the behest of NASA. A Statement of Work dated September 12, 1990 providing for a portion of the interior containment work was incorporated into the contract via Modification 1.[5] Additionally, around the same time

4. Defendant does not dispute this interpretation of the BAAQMD regulations.

5. Modification 1 was signed by Ernie Watson, vice president of SIPCO on November 27, 1990 and by Kevin Carey, CO for the project, on December 5, 1990, and thus incorporated into the contract. In addition to increasing the value of the contract by approximately $53,000, it reads as follows:

ITEM 1: Due to the unforeseen intrusion of dust/grit through the exterior wall of the wind tunnel, it is necessary to install additional containment and negative air to protect the occupied spaces of the north offices. Provide the following for Bents 37 through 42:

1. Install a solid visqueen wall inside the wind tunnel structure, from the bottom of the wind tunnel floor to the ground floor, to form a barrier against immediate grit intrusion.

2. Interior containment zones shall extend no more than the exterior containment in which blasting and coating operations are in process.

3. Each zone shall be sealed at the ends and be supplied with negative air from a separate dust collector dedicated for this purpose and shall be in operation fulltime during blasting and coating operations.

4. Containment shall be inspected by NASA before blasting or coating operations commence.

5. All surfaces within the interior containment shall be cleaned with HEPA vacuums before removal of the containment.

ITEM 2: Miscellaneous sand and debris exists on top of the exterior horizontal beams in Area 3. This debris was left from a previous contract and was not visible during the prebid conference....

Def.'s Ex. 65 at 2.

as the internal dusting was experienced, the parties found that dust was also escaping from the exterior containment. It was then that Kono began setting off smoke bombs to judge the effectiveness of the containment and to determine the possible wind patterns taken by escaped dust, so that he could then order SIPCO to clean those areas he considered affected.

As a result of their efforts to meet NASA's demands for increased and tightened containment, SIPCO's operation was severely and negatively impacted. Blast schedules were disrupted and materially delayed not only by the greater than anticipated amount of time spent assembling and disassembling the containments but also by NASA's insistence on SIPCO's passing *ex contractu* smoke bomb tests before blasting could be performed. SIPCO's costs increased dramatically due to these demands. Within a month of the commencement of blasting operations, SIPCO was behind in its original work schedule. Another source of delay, beginning in October 1990, which was beyond the control of either party, was inclement weather that effectively prevented coating of the steel structure according to the terms of the contract. If the atmospheric conditions noted earlier were not present for coating application, SIPCO was contractually prohibited from blasting and coating operations regardless of its state of preparedness to do so.

In December 1990, SIPCO requested a new completion date of May 17, 1991. Additionally, due to prohibitive weather conditions for the application of the paint system, SIPCO intended to shut down blasting operations for the winter months. NASA did not object to or even comment on the extension of the completion date beyond the original January 18, 1991 deadline. In fact, NASA consented to the shutdown. During that time, SIPCO maintained a limited on-site presence with workers performing interior containment and touch-up work. As the weather failed to improve, on February 14, 1991 SIPCO requested an extension of time for contract completion from May 17, 1991 to August 16, 1991. NASA failed to respond in any way to SIPCO's February 14, 1991 extension request. Although SIPCO had planned to recommence blasting on April 1, 1991 it did not resume blasting until May 1, 1991.[6] Walton's credible testimony demonstrated that during the spring months of 1991, he orally informed either Kono or Carey that SIPCO would require additional time beyond August 16, 1991. The government disputes this sworn testimony. It contends that at an April 24, 1991 meeting between SIPCO and NASA personnel, SIPCO represented it would be able to complete the contract by August 16, 1991. Unquestionably at that time, NASA proposed no formal contract modification instituting August 16, 1991 as the new completion date.

Also, at the April 24, 1991 SIPCO–NASA meeting, SIPCO presented an informal claim to NASA seeking compensation for its cost overruns on the project. Despite its detail as to the costs incurred, the claim was uncertified. On June 3, 1991, the government states it was informed by SIPCO that it might have to shut down the project because of its uncompensated costs asserted in the April 24, 1991 claim. Nevertheless, on June 11, 1991, Carey *unilaterally* issued Modification 3, which in addition to confirming additional internal containment work[7] already performed by SIPCO, stated "[t]he period of performance is extended by 210 calendar days to August 16, 1991." Def.'s Ex. 105 at 1. Modification 3 was issued despite SIPCO's oral representations to Kono between April 24 and June 11, 1991 that it could not meet an August 16, 1991 date, despite the informal claim, and despite SIPCO's representations only eight days earlier that it may have to shut down the project.

---

6. There is no evidence in the record that this postponement was due to SIPCO's neglect or negligence. There is no credible evidence that Kono objected in any fashion to this postponement when it was proposed.

7. The internal containment directed by Modification 3 was of the same nature as that stated in Modification 1, but here was specific to Bents 28 through 36. Modification 4, which was issued unilaterally by Carey on August 26, 1991, increased the price of the contract by approximately $388,000 for the Modification 3 work.

In Kono's May 6, 1991 MEMORANDUM FOR RECORD to Carey, he stated:

> The contract specifications do not specify any percent containment. The specifications requires [sic] SIPCO to perform its work without exceeding health and safety and environmental regulations as specified.

Jt. Ex. 39 at 1 (emphasis added).

Kono stated on page two, "*Again I must stress that the percent of containment was never specified, only that the airborne lead emissions be within the regulated allowable limits.*" Jt. Ex. 39 at 2 (emphasis added). The court reads the phrase "regulated allowable limits" to be a direct reference to those regulations stated in the contract, including BAAQMD, and the manner in which those regulations require testing to be performed, not how NASA twisted the rules. Further, Kono wrote, again on May 6, 1991, "*For the most part,[8] SIPCO's containment has been operating in compliance with the environmental regulations.*" Jt. Ex. 39 at 4 (emphasis added).

At a June 5, 1991 meeting originally called to discuss SIPCO's informal claim, SIPCO requested from NASA a written description of the criteria used for the placement of the high volume air monitors. Carey instructed Kono to provide this information to him. Kono subsequently discovered, upon meeting with ChemWaste representatives, that the monitors had been improperly placed per BAAQMD rules. Kono, in direct contravention of his duty as the COTR for this project, did not inform Carey of this fact.[9] NASA then attempted to justify its misplacement of the air monitors. The ChemWaste reports, which were generated throughout the project, were changed to add: "The BAAQMD standard for respirable airborne lead concentrations is 1.0 microgram of lead per cubic meter of air ... which pertains only to off-site emissions. NASA adopted this standard for on-site lead emissions as an indicator for risk of any on-site public exposure." This is the first occasion upon which NASA proclaimed and attempted to justify what it had been doing all along: enforcing a standard SIPCO was not contractually obligated to meet.

During July and August 1991, NASA's interference became even more invasive respecting SIPCO's work practices. After failing a July 10, 1991 smoke test, NASA directed SIPCO to halt blasting activities because of leaking containment. SIPCO was permitted to resume operations after consenting to operational restrictions. Also, before fully completing work on Area 13, the cone, SIPCO began moving scaffolding back to Area 2 planning to recommence blasting on that section. Carey, by written directive, ordered SIPCO to cease mobilization of Area 2 before fully completing the cone.

On August 7, 1991, NASA issued an order for SIPCO to show cause as to why the contract should not be terminated for SIPCO's apparent inability to complete the work by August 16, 1991. SIPCO provided a timely response on August 22, 1991. In its response, SIPCO requested an extension of the completion date until January 4, 1992, arguing it was entitled to 134 additional days beyond August 16, 1991 largely due to inclement weather, subjection to the smoke bomb tests, NASA's excessive enforcement of the containment provisions of the contract, and its use of safety standards not stated or incorporated into the contract. Notwithstanding SIPCO's response, based upon Kono's recommendation, Carey issued a termination for default on September 4, 1991. Carey testified that, at the time of the termination for default, he possessed no knowledge of the proper application of BAAQMD

---

8. There is no evidence that SIPCO ever violated any safety regulations whether local, state or federal.

9. Kono confirms this through his testimony:

Q From the beginning of the project, Mr. Kono, on May 23 or 24, whenever it was, of 1990, until at least June 5, 1991, you did not know whether NASA was properly applying the full regulations for the emissions of lead of the [BAAQMD] rules, did you?
A I would have to agree to that.
Transcript at p. 2227, 11.9–14.
Q Did you ever tell Mr. Carey we have been enforcing a standard which was incorrect?
A No, I never told him that either.
Transcript at p. 2359, 11. 12–14.

standards or NASA's misapplication of the governing 1.0 standard to SIPCO's work.[10]

On or about April 27, 1992, SIPCO submitted a letter ("April 1992 claim") to the CO seeking: (1) conversion of the termination for default to a termination for convenience; (2) payment of its termination for convenience costs; (3) an extension of time to complete contract performance; (4) recovery of costs for alleged additional work; and (5) payment of unpaid fringe benefits, which the Department of Labor claimed SIPCO owed its personnel.[11] The President of SIPCO, Roy Brock, attempted to certify SIPCO's April 1992 claim by including the following language in his certification:

> I hereby certify that I have reviewed the claims contained herein and that they are true and correct to the best of my knowledge, information and belief. I further certify that I am an officer of SIPCO Services & Marine and am authorized to execute this claim on behalf of the Company.

The CO issued no decision on the April 1992 claim.

On May 22, 1992, NASA and the surety of SIPCO, the Insurance Company of North America ("ICNA"), memorialized an agreement ("Settlement Agreement") concerning the methods by which the work remaining in Contract No. NAS2 13209 would be performed. In this Settlement Agreement, ICNA agreed, *inter alia*, to compensate NASA for the alleged damages arising out of the additional time required to complete the work and to pay the contract price of a succeeding contractor to complete the remaining work. After ICNA had made payments to NASA, ICNA sought and obtained reimbursement from SIPCO for all the monies paid to NASA as well as the monies spent in investigating and addressing NASA's demand on SIPCO's performance bond.

Robison–Prezioso was selected as the reprocurement contractor for the remainder of SIPCO's Phase I contract work. Though Robison–Prezioso began the reprocurement work in July 1992, it was already on-site performing work under its own Phase II contract. The specifications for Phase II were remarkably more detailed than those applicable to Phase I. Also, in the Phase II contract Kono spelled out NASA's expectations with much greater clarity. For example, that contract differed from SIPCO's contract by containing language that the BAAQMD regulations would be adopted to on-site areas, by providing for adequate treatment of the inaccessible areas, by indicating smoke tests would be used to test the quality of the containment prior to blasting, by quantifying negative air requirements in the containment zones, and by informing bidders of the building wall's porosity. Furthermore, in an acknowledgment that greater time would be needed by the contractor in light of these special requirements, Robison–Prezioso was given, on a square feet per day production basis, ten times more scheduled time to complete the work. At least some of Robison–Prezioso's work was performed using "spider baskets" instead of scaffolding.

---

10. Carey stated, at one point, that knowledge of the enforcement of standards against SIPCO beyond contract requirements would "not necessarily" have affected his decision to issue a termination for default. Later, he clarified his remark:

Q If SIPCO had been vastly affected in its operations because of the application of standards and regulations far more stringently than what was called for in the contract, that would have affected your decision to terminate them for default, would it not?

A *If the government directed them to do work exceeding the contract requirements, then they were entitled to be paid for it or given additional time or both.*

Transcript at p. 1761, 1.19–p. 1762, 1.1 (emphasis added).

11. This matter was settled with the Department of Labor. SIPCO's counsel stated that the original claim amount of just over $394,000 for monies retained by NASA pursuant to the Department of Labor's request have been paid to the Department of Labor or returned to SIPCO. That amount has been deducted from the Amended Claim. To the extent that fringe benefits are part of its Amended Claim, SIPCO's claim is for those actually paid during contract performance, or for those that are an element of individual claims for which SIPCO seeks recovery due to government interference and delay, and for which presumably it would have had to pay a fringe benefit anyway.

This method permits a worker to be suspended over a work area and to swing laterally to reach additional areas before being raised or lowered vertically. Despite questions raised concerning this method's possible violation of OSHA rules, it obviously allows for faster completion. Government counsel asserted during post-trial oral argument that Robison–Prezioso's reprocurement work was done according to Phase I specifications. However, in his testimony Kono acknowledged that the reprocurement work was performed using the detailed Phase II, and not the Phase I specifications.

By letter dated July 29, 1992, SIPCO submitted a revision of its April 1992 claim, in which SIPCO not only reiterated those matters raised by the April 1992 claim but also sought payment of those amounts covered by SIPCO's surety, ICNA, in order to complete performance of Contract No. NAS2 13209. The July 1992 revision was properly certified by Brock using the precise language set forth by the CDA. *See* 41 U.S.C. § 605(c)(1) (1988). On September 3, 1992, SIPCO filed its original complaint in this court. On February 28, 1994, the court ruled on defendant's motion for partial dismissal.[12] Then on April 14, 1994, and December 6, 1996, plaintiff's second and third amended complaints, respectively, were filed by leave of the court. Defendant filed its answer by leave of the court on December 30, 1996. This action is an appeal of the CO's September 4, 1991 termination for default and of the CO's deemed denial of the July 1992 claim.

### Contentions of the Parties

Plaintiff contends that it incurred damages as a result of NASA's over-inspection and interference with its contract performance. According to plaintiff, NASA erred in drafting the contract specifications and misinterpreted the relevant statutory and regulatory provisions. Plaintiff contends that NASA's contract documents are plagued by ambiguities and unexpressed intent, which led to plaintiff's expenditure of additional time and

money to perform work under the contract. Plaintiff claims that NASA imposed restrictions on plaintiff's performance, including absolute containment of airborne lead particulates, that were neither required by law or regulation nor mandated in the contract specifications. Plaintiff contends that without proper modification to the contract Kono directed the performance of smoke bomb tests as a means of indicating where dust from blasting operations was escaping and thereafter could have settled. This interference, argues plaintiff, forced SIPCO to materially alter the course of its performance, reduce its anticipated level of productivity, and incur substantial unforeseen expenses due to the resultant delays. Further; it argues that because its work was delayed due to NASA's unjustified interference rather than plaintiff's own fault and inefficiencies, the contract termination for default was for the government's convenience rather than SIPCO's default. Therefore, says SIPCO, the court should convert the termination for default to a termination for convenience pursuant to FAR § 52.249–2, and award it the total amount of damages it seeks in its Amended Claim, including its costs and expenses related to a termination for convenience, its delay damages, attorneys' fees, consultants' fees, and costs.

Defendant argues that the CO's termination for default of the contract was proper as a matter of law and that conversion of the termination for default to a termination for convenience by this court would be improper. Defendant further argues that plaintiff has not met its burden of demonstrating that its termination for convenience costs were reasonable and actually incurred. Defendant challenges plaintiff's assertion that the government is responsible for plaintiff's delays, for, according to defendant, SIPCO has failed to show that its delays in and damages from contract performance arose from unforeseeable causes beyond plaintiff's own control and responsibility. SIPCO's fault or negli-

---

12. Defendant moved for partial dismissal on January 15, 1993. Defendant asked the court to dismiss Count II of plaintiff's complaint because the claim was not properly certified, and Count III because the Contracting Officer never issued a final decision. The court granted the motion as to Count II, but denied it as to Count III believing SIPCO to have properly deemed its claim denied.

gence, contends the defendant, is the sole cause of plaintiff's alleged injury and that the requirements placed upon plaintiff were within contemplation of the contract specifications accepted by plaintiff. The government argues that it informed bidders at the pre-bid conference that air monitors would be placed in and around the containment site, as opposed to just at the property line, and that a 1.0 standard was to be applied to these monitors. Further, the government argues that NASA stated in the contract its intent to monitor ambient air "during blast cleaning operations." NASA contends that the smoke tests were the result of a mutual agreement between Walton and Kono to identify gross containment leaks, with the understanding that SIPCO would repair any major holes before blasting again. To the extent the contract documents may be subject to more than one reasonable interpretation, defendant claims that any ambiguities are patent and impose on plaintiff a duty to inquire as to proper interpretation which defendant says was not done. Finally, defendant charges plaintiff with responsibility for causing its own damages through its own delays due to identified inefficiencies in its work practices.

## DISCUSSION

### A. Contract interpretation and the resolution of any ambiguities.

In resolving the dispute between SIPCO and NASA, the court will rely, for the most part, on the relationship the parties established in writing. The court will first examine closely the relevant contract documents which contain the parties' respective obligations. The provisions of these documents will be interpreted in conformity with long established principles of contract construction. "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1058 (Fed.Cir.) *cert. denied,* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983)

*quoted in Acacia Villa v. United States,* 36 Fed.Cl. 277, 282 (1996). Thus, in its interpretation of the contract, the court will give weight to what the parties initially believed their respective obligations to be prior to any dispute.

In examining the contract documents, the court is guided by the principle of contract interpretation that "[w]here the provisions of a contract are phrased in clear and unambiguous language, 'the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties....'" *Aluminum Co. of America v. United States,* 2 Cl.Ct. 771, 776 (1983) (quoting *Elden v. United States,* 223 Ct.Cl. 239, 252, 617 F.2d 254, 260–61 (1980)). Further, where an interpretation is available that gives a "reasonable meaning" to all parts of the contract documents, that interpretation will be preferred "to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous...." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965) (citations omitted). As this case involves the conduct of two parties in a contractual relationship, each with intimate and detailed knowledge of the conduct and expectations of the project, "[i]t is elementary that the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar,* 169 Ct.Cl. at 388, 351 F.2d 972. The court has made its factual findings based upon such factors. It has weighed the documentary evidence and given due credibility to the testimony of the parties' witnesses about those documents.

The issue of proper contract interpretation arises when assessing questions relating to the inaccessible areas and air monitoring. The court will address the issue of air monitoring first.

As noted above, the contract documents specifically discuss the issue of ambient air monitoring. In two instances in particular,[13] the government states its intent

---

13. Point 2.1 of SECTION 1300 SAFETY PROVISIONS and discussion at point 1.2 SUBMIT- TALS of SECTION 01150 SUBMITTALS.

is to monitor the ambient air, not as a "tool," but rather "to ensure compliance with environmental requirements." The court reads this language as a reference to those environmental standards incorporated into the contract; "environmental requirements" could thus only refer to those laws and regulations such as the BAAQMD regulations, among others. Interpretation of the contract to effect its plain and ordinary meaning necessitates this conclusion.

The government's responses to this interpretation are unpersuasive. It argues that Kono told bidders at the pre-bid conference about how air monitoring was to be done. However, whatever Kono may have told the bidders during this conference concerning monitor placement is without legal effect. The specifications, which Kono played the dominant (to say the least) role in drafting, clearly warn bidders that oral explanations or instructions given at the pre-bid conference will not be binding. Thus, even if Kono gave oral notice of an intent to place monitors inside the property line to enforce a 1.0 standard, this notice did not effect a binding modification of the contract's express air monitoring regulations nor did this notice suggest that such monitors would form part of an inspection system to enforce an unreasonable interpretation of the specified regulations. "Environmental requirements" in the context of ambient air monitors point to the BAAQMD regulations and we conclude that the government's own contract specifications, as written, support this finding. If NASA really intended for the monitors to be used merely as an inspection tool, clearly SIPCO had no legally binding notice of that intent. The court rejects the government's argument as an after-the-fact interpretation which is without merit.

Moreover, NASA's claimed use of a 1.0 standard defies logic. The BAAQMD 1.0 standard only possesses meaning when used in the context of operating monitors as called for by the BAAQMD regulations. Unless monitors are run in accordance with BAAQMD rules, using the 1.0 standard is unfair to the contractor unless it has notice, in writing, of the government's intent to divorce the number "1.0" from the regulation that gives it substance. Furthermore, although the contract stated NASA would monitor during blast cleaning operations, it did *not* provide that monitoring would occur *only* during blast cleaning operations. Also, government's counsel now argues that SIPCO contractually guaranteed 100% containment. This, too, is illogical.[14] In that case, why use a 1.0 standard at all? Would not any emission of lead dust from the containment serve as the basis for a shutdown? The government cannot now legitimately argue for an interpretation of the monitoring provisions which is not even in accord with Kono's initial statements. The court rejects government counsel's argument that NASA should have received 100% containment. Clearly, the air monitors which were improperly deployed at the containment site were deployed not to check for any lead emissions but for emissions on a 1.0 scale, a scale that is totally meaningless unless derived from monitors deployed as instructed by the BAAQMD rules set forth in the contract. In these circumstances, the government's belated attempt to bolster its position fails. As the court will elaborate upon later, NASA had the right under the contract to place the monitors wherever it desired, but the readings obtained from misplaced monitors improperly operated are not pertinent to judging SIPCO's compliance with safety requirements specified in the contract. To the extent that their placement contributed to Kono's costly and unjustified interference with SIPCO's performance, the government breached its contract with SIPCO and is accountable in damages.[15]

14. In defendant's notice of factual errors government counsel argues that her statements at post-trial oral argument that NASA "deserved a sealed containment" did not amount to a claim for 100% containment. This is a distinction without a difference. By arguing for sealed containment defendant implicitly argues for 100% containment. Nonetheless, even accepting as true government counsel's statement that she did not mean "sealed" to equate with 100% containment, that fails to excuse the overall misinterpretation and misapplication of standards on this project. That is the crux of this dispute, and this is where fault with the government lies.

15. Interestingly, NASA stated it adopted the BAAQMD standard on-site, but failed to apply

■ Furthermore, the contract language about air monitor placement is unambiguous. Contract language "may be said to be ambiguous when it is capable of more than one reasonable interpretation." *Neal & Co. Inc., v. United States,* 19 Cl.Ct. 463, 471 (1990) (citing *Southern Constr. Co. v. United States,* 176 Ct.Cl. 1339, 1361, 364 F.2d 439 (1966)). Assessing whether a contractor's interpretation was reasonable requires the court to "put itself in the place of a reasonable and prudent contractor." *Neal & Co.,* 19 Cl.Ct. at 473 (citations omitted). Although the court finds no ambiguity where the air monitors are concerned, even if there existed some degree of ambiguity about ambient air monitoring, SIPCO, under our analysis, would still prevail on this point.

■ "The law is well settled that ambiguities in a contract are to be resolved against the drafter of the contract." *Interstate Gen. Gov't Contractors, Inc. v. Stone,* 980 F.2d 1433, 1434 (Fed.Cir.1992) (citation omitted). Even if the contract is ambiguous, as long as the contractor follows a reasonable interpretation, the contractor's interpretation controls. *Id.* This is the principle of *contra proferentum.* The Supreme Court "has declared that '[t]his principle is appropriately accorded considerable emphasis' in cases where the government was the drafting party, 'because of the [g]overnment's vast economic resources and stronger bargaining position in contract negotiations.' " *Blough v. United States,* 17 Cl.Ct. 186, 189 (1989) (quoting *United States v. Seckinger,* 397 U.S. 203, 216, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970)). In short, even if the contract was in some degree ambiguous on the question of ambient air monitoring, which is not the case, SIPCO's interpretation was reasonable and will

be held against the government. If NASA wanted its air monitors placed within the job site and readings taken in a restricted way, it had the power to order that done. However, *in the absence of a formal modification to the contract* specifically incorporating such procedures, the data obtained from such monitors would be totally irrelevant to determination of safety issues.

■ Next, the court turns to the issue of the inaccessible areas. *Contra proferentum,* however, does not always work against the government in the interpretation of ambiguous contract documents. "If a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid." *Newsom v. United States,* 230 Ct.Cl. 301, 303, 676 F.2d 647, 648 (1982) (citing in footnote *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 6, 314 F.2d 501, 504 (1963); *Blount Bros. Constr. Co. v. United States,* 171 Ct.Cl. 478, 495–96, 346 F.2d 962, 971–72 (1965)). This duty exists "regardless of the reasonableness of the contractor's interpretation." *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985) (citing *Newsom v. United States,* 676 F.2d 647, 649–50, 230 Ct.Cl. 301 (1982); *FFR Building Specialties v. United States,* 229 Ct.Cl. 538, 539–40 (1981)). Further, the duty of inquiry is imposed not out of a standard of actual contractor knowledge, but rather the "obviousness of the discrepancy" controls. *Hannon Elec. Co. v. United States,* 31 Fed.Cl. 135, 145 (quoting *Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972)).

■ In examining the legal import of a patent ambiguity, a two step analysis is

the standard properly, meaning 24 hour monitoring and 30–day averaging. The government's position that the 1.0 standard was "merely an inspection tool" stands totally contradicted by the facts and is not only not credible but smacks of bad faith deserving of censure. By requiring SIPCO to rigidly comply with an *ex contractu* onsite application of BAAQMD rules, NASA materially interfered with SIPCO's performance to its detriment. As previously noted, NASA's failure to run the monitors in accordance with the rules which give the 1.0 standard its meaning, is inherently unfair. All of the standards must be applied to give any meaning to the 1.0 standard.

To operate the monitors only during blasting and cleaning operations when lead is likely to be emitted, i.e. eight hours or less rather than for 24 hours, denies SIPCO credit for the time when it was not engaged in "blast cleaning operations." This unfairly reduces the denominator (time) used to calculate the number of micrograms per cubic meter of lead emitted over the assumed 24–hour period. In fact, given the readings actually obtained from NASA's misplaced monitors, it is highly unlikely that SIPCO ever would have breached the BAAQMD 1.0 standard had NASA operated such monitors for a full 24 hours.

employed. First, the court asks whether the ambiguity was patent—a patent ambiguity being, of course, an obvious one. However, "[t]his is not a simple yes-no proposition but involves placing the contractual language at a point along a spectrum: Is it *so* glaring as to raise a duty to inquire?" *Newsom*, 230 Ct. Cl. at 304, 676 F.2d 647 (footnote omitted). Only if the court rules that the ambiguity was not patent is the second step reached, where the court asks whether the plaintiff's interpretation was reasonable. *Id.* (footnotes omitted). In other words, reasonableness of contractor interpretation is irrelevant if the ambiguity is deemed patent.

■ In the case at bar, NASA presented bidders with specifications for the blasting and coating of the steel structure. Those specifications stated the type of paint system to be used. That system, however, omitted consideration of the unique treatment required of the inaccessible areas. The absence of specific language for special treatment of these areas created a patent ambiguity because it would have been obvious to a reasonably prudent contractor that the system specified would not successfully deal with the inaccessible areas. Thus, SIPCO's duty of inquiry was triggered. SIPCO has shown to the court's satisfaction that at the pre-bid conference, it specifically inquired about the inaccessible areas and was told, as were others present, to bid the specification as stated and the issue of inaccessible areas would be handled later. SIPCO, therefore, fulfilled its duty to inquire. At that point, the burden shifted to the drafter of the specifications, NASA, to remedy this patent defect in its bid documents. This patent defect, however, whether through negligence or oversight, was not corrected. If NASA still expected all inaccessible areas to be blasted and coated to specification requirements in these circumstances, that expectation was unreasonable.

■ "[I]f the contractor is bound to build according to plans and specifications prepared by the owner," which SIPCO was bound to do, "the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct.

59, 63 L.Ed. 166 (1918) (citations omitted). This is so because "[w]hen the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifications are followed a satisfactory product will result." *Hol–Gar Mfg. Corp. v. United States*, 175 Ct.Cl. 518, 525, 360 F.2d 634, 638 (1966) (citing *United States v. Spearin*, 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Helene Curtis Industries v. United States*, 312 F.2d 774, 160 Ct.Cl. 437 (1963); *R.M. Hollingshead Corp. v. United States*, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953)). In this case, SIPCO complied, consistent with its obligations as a contracting party, with specifications defective as to the inaccessible areas. The correspondence between NASA and SIPCO is clear indication that both SIPCO and the government had knowledge about the import of this problem.

When the government requires a contractor to comply with specifications it has drafted, it warrants that complying with them will lead to successful completion of the job. SIPCO was requested to bid a completed project as called for by the specifications. The specifications, as drafted, did not permit successful blasting and coating of these areas to specification requirements. Despite SIPCO's repeated statements about the necessity of resolving this question, until July 1990, NASA persistently refused to yield on this issue. Therefore, a modification to the contract was required. One was never issued. Dave Walton sent a letter to Kono stating that SIPCO's proposed treatment of the inaccessible areas was "a no-cost modification." SIPCO contends that that letter does not constitute a legally binding modification to the contract. We agree. It was never the subject of a formal written contract modification signed by the parties. In short, the defective specifications remained in place while SIPCO expended sums in excess of its bid to treat areas required to be treated but substantively ignored in the specifications. Thus, the court adheres to the precedent that "[i]f the warranty is breached, *i.e.*, the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifica-

tions." *Hol–Gar*, 175 Ct.Cl. at 525, 360 F.2d 634.

## B. *The duty to cooperate and the matter of delay brought about by excessive supervision and government interference.*

 "It is black letter law that every contract with the government contains an implied obligation that neither party will do anything to prevent, hinder, or delay performance." *Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 67 (1992) (citing *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977)). It is within this context that the court considers the allegation that NASA hindered and delayed SIPCO's performance through the imposition of standards not contemplated by the contract documents. The duty of cooperation between parties to a contract is undisputed. Specifically directed to NASA, "the government has an implied duty to cooperate with its contractors." *Information Sys. & Networks Corp. v. United States*, 34 Fed.Cl. 457, 460 (1995) (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir.1988)). The government's duty of cooperation inheres in the idea that it not hinder contractor performance, but the government "must do whatever is necessary to enable the contractor to perform." *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 204, 550 F.2d 26, 32 (1977) (citing *Kehm Corp. v. United States*, 93 F.Supp. 620, 623, 119 Ct.Cl. 454, 469 (1950)). Thus, the government's obligation has both positive and negative aspects.

 This implied obligation is breached "when delay occurs because of excessive supervision or control over the contractor." *Lathan Co., Inc., v. United States*, 20 Cl.Ct.

122, 129 (1990) (citing *Roberts v. United States*, 174 Ct.Cl. 940, 357 F.2d 938 (1966)). It is true, however, that its obligation not to hinder performance does not foreclose *all* government action with regard to the contractor's performance of the contract. As a matter of fact, "the Government may, without liability, merely direct the contractor to perform in accordance with the terms of the contract." [16] *Id.* at 128 (citing *H.L.C. & Assoc. v. United States*, 176 Ct.Cl. 285, 307, 367 F.2d 586, 599 (1966)). Nevertheless, although the government may insist upon contractor compliance with the terms of the contract, "the government cannot impose a more stringent testing procedure or standard for demonstrating compliance than is set forth in the contract." *United Technologies Corp., Sikorsky Aircraft Div. v. United States*, 27 Fed.Cl. 393, 397 (1992) (citations omitted). Where government actions delay contractor performance and increase costs, "the contractor has a claim for damages." *Lathan*, 20 Cl.Ct. at 129 (citing *Lewis–Nicholson*, 550 F.2d at 26).

 The totality of all of these issues of monitoring and testing bears largest upon questions concerning the size and quality of the containment and which party is responsible for the resultant delays. As a preliminary note to this discussion, the contract specifications list no requirement concerning the size of the containment. In its safety plan and follow-up letter, SIPCO indicates nothing concerning containment size. Additionally, NASA did not raise the issue prior to commencement of blasting.

The contract documents state the legal and contractual obligations of the contractor. They also require the submission of a safety and containment plan.[17] While the safety

---

16. Government counsel's argument that directives relating to "sealed" or 100% containment merely required SIPCO to comply with contract terms is unpersuasive. The court has already demonstrated that sealed/100% containment was not required by the contract nor contemplated by the approved safety plan. Therefore, this citation provides no sanctuary for defendant's argument.

17. NASA argues that SIPCO violated its own safety plan by failing in some instances to secure the tarps to the ground. However, the principal

purpose of containment was to prevent the emission of lead dust to the extent SIPCO would not violate the applicable safety laws and regulations. There is no evidence that any failure to secure the tarps resulted in a safety violation. It is true that the specifications state that the "Contractor shall be responsible for the removal, containment, on-site handling, and the disposal of the red lead hazardous waste." Def.'s Ex. 8 at 51. However, this provision does not grant NASA a carte blanche right to control SIPCO's containment efforts. Rather, only if SIPCO mishandled the lead dust to the extent that it created

plan discussed SIPCO's use of negative air, air exchanges were never a requirement within the specifications. Kono's inquiries into the subject never rose to the level of an "informal" requirement. Watson's correspondence concerning this subject did address air exchanges but not pursuant to a NASA or safety plan requirement. While SIPCO stated it would take special care to seal any and all openings and overlaps, it also stated its intention to suspend tarps and netting to control and contain contaminants, an obvious reference to lead particles. This is a far cry from a contractual guarantee of 100% containment on the project, but rather, anticipates containment only to a degree that a reasonably prudent contractor could be expected to achieve. Moreover, the planned use of tarps and netting as containment materials totally supports this conclusion. Tarps and netting are inherently porous. In fact, the thing SIPCO clearly promises to "seal" are openings and overlaps in how the containment zone is assembled *over exposed bare ground.*

Kono acknowledged to his supervisor over a year after awarding the contract to SIPCO that "[t]he contract specifications do not specify any percent containment." Employment of smoke bombs to test the quality of the containment, the requirement of smaller containment zones than SIPCO contemplated,[18] and the improper use of data from misplaced air monitors serve to crystallize the pattern of over-regulation and excessive supervision that pervade the history of this contract. At post-trial oral argument government counsel argued that SIPCO guaranteed NASA a "sealed" containment, meaning a 100% containment. However, Kono stated,

in discussing his letter dealing with smoke bomb tests, that he did not intend to require 100% containment. Furthermore, the government argues it never directed SIPCO's containment. When the COTR threatens to shut down a project if containment zones are not made smaller by using visqueen sheeting, the court is satisfied that significant interference and unjustified owner direction has been demonstrated. Accordingly, we reject counsel's argument as contrary to defendant's own evidence as well as plaintiff's evidence. We find no contractual requirement for 100% containment.

Within the FAR Safety and Health Clause cited in the contract, it is stated that the Contracting Officer [19] may direct SIPCO to perform "safety and health measures," but such direction may trigger an equitable adjustment in favor of SIPCO. Clearly, NASA wanted a much safer project than its specifications required. Where, as here, (1) the contract documents incorporate the principle of equitable adjustments for contractors and (2) there exists a documented pattern of excessive supervision and the imposition of testing procedures beyond that contemplated by the contract documents, the contractor (SIPCO) possesses a strong and viable claim for damages.

### C. *NASA's waiver of the completion date.*

The contract was originally scheduled to be completed on January 18, 1991. That date was soon recognized by the parties as unrealistic. On that date, SIPCO was in the middle of its so-called winter shutdown due to adverse weather. At that time, both parties knew that a new date was needed because SIPCO's work was far from com-

---

a real safety problem in violation of the applicable regulations would NASA have had a right to complain. NASA, by its own admission, never expected 100% containment in the specifications or from SIPCO's safety plan. We find that application of this overly strict standard goes beyond the requirements of the contract and constitutes yet another instance of NASA's over-inspection.

**18.** Once again, a government denial is contradicted by its own evidence. Despite the government's argument that NASA never directed SIPCO with respect to its containment, Kono said:
Q [referencing a Kono memo] ... On this occasion, you were telling SIPCO, whether it

was in a meeting or by the copies of this memo that you sent to David Walton, that if they did not put up the Visquin [sic] wall separating the containment on the exterior, there was, in your language, a possibility of stopping blast operations?
A That's correct.
Transcript at p. 2323, 11. 15–23.

**19.** The issue of whether Ken Kono had the requisite binding authority to direct SIPCO, rather than only Kevin Carey himself, will be discussed later in the opinion.

plete. SIPCO argues that this unrealistic completion date was impliedly waived by NASA.

The waiver doctrine involves "the abdication of a right under a contract," and it may occur by implication. *Miller Elevator Co. v. United States*, 30 Fed.Cl. 662, 686 (1994) (citation omitted). "The purpose of the waiver doctrine is to protect contractors who are led to believe that time is no longer of the essence and undertake substantial efforts after the performance date specified in the contract has passed." *State of Florida, Dep't. of Ins. v. United States*, 81 F.3d 1093, 1096 (Fed.Cir.1996) (citing *Olson Plumbing & Heating Co. v. United States*, 221 Ct.Cl. 197, 602 F.2d 950, 955 (1979)). In terms of application, when a performance date passes and the contractor has not been terminated for default, "the inference is created that time is no longer of the essence so long as the constructive election not to terminate continues and the contractor proceeds with performance." *DeVito v. United States*, 188 Ct.Cl. 979, 991, 413 F.2d 1147, 1154 (1969). In this case, the January 18, 1991 completion date passed without protest from NASA. NASA also consented to SIPCO's winter shutdown. During the shutdown period, SIPCO was performing tasks in preparation for resumption of full blasting and coating operations which occurred on May 1, 1991. Therefore, by permitting SIPCO to resume full operations without ever objecting to this weather delay, the court finds, in legal terms, that the government waived the January 18, 1991 completion date.

Thus, NASA readily accepted SIPCO's continued performance beyond the contract due date. "Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given." *DeVito*, 188 Ct.Cl. at 990, 413 F.2d 1147. Because NASA continued to permit SIPCO to deliver performance, once a reasonable time had passed, NASA surrendered its ability to terminate for default. The ques-

tion exists as to what is a reasonable time. The court notes that "[w]hat is a reasonable time for the Government to terminate a contract after default depends on the circumstances of each case." *DeVito*, 188 Ct.Cl. at 991, 413 F.2d 1147 (citations omitted). The court believes that while there may be no predetermined number of days that define a reasonable period of time, it is clear that the government's termination on September 4, 1991 was clearly beyond any conception of reasonable time in light of the events following the original January 18, 1991 completion date. For example, NASA's willingness to grant a shutdown period until April 1, 1991, and subsequent assent to an extension of that date to May 1, 1991, are persuasive that NASA did not regard time as being of the essence.

Once a reasonable time had passed, NASA's ability to terminate for default for failure to meet a completion date could only be reinstated with the fulfillment of certain conditions. "The proper way thereafter for time to again become of the essence is for the Government to issue a notice under the Default clause setting a reasonable but specific time for performance on pain of default termination." *DeVito*, 188 Ct.Cl. at 991–92, 413 F.2d 1147. It is, therefore, not enough simply to set a new date. Rather, "the notice must set a new time for performance that is both reasonable and specific from the standpoint of the performance capabilities of the contractor at the time the notice is given." *DeVito*, 188 Ct.Cl. at 992, 413 F.2d 1147 (citation omitted). In this case, NASA did not issue such a notice.

SIPCO disputes NASA's claim that, at an April 24, 1991 meeting, it guaranteed completion by August 16, 1991. We accept as credible SIPCO's argument that any statement by Walton or any other representative at this meeting did not amount to such a guarantee. However, even if it did express the view that it could complete the work by August 16, 1991, the government may not rely upon such a statement as a means of reestablishing time of the essence. First, August 16, 1991 was not memorialized at that time by way of the required government

notice from NASA to SIPCO that a new completion date was established on pain of default termination. Second, the record clearly indicates that throughout the spring months, which include April and May 1991, Dave Walton repeatedly informed Ken Kono that SIPCO was not going to be able to meet a mid-August deadline. In short, SIPCO had no obligation to meet a mid-August deadline because one had not been properly set. Any failure by Kono to inform Carey of these conversations does not excuse NASA from its obligation to set a new, reasonable completion date by proper notice. Finally, as the government points out in its post-trial proposed findings of fact, on June 3, 1991 SIPCO informed the government of a possible shutdown of the project because of NASA's failure to address SIPCO's uncertified claim which it submitted on April 24, 1991. It is inconceivable, and inherently contradictory in these circumstances, that NASA could have reasonably expected completion of the contract by August 16, 1991. Yet, on June 11, 1991, Carey unilaterally issued Modification 3 which set a new completion date of August 16, 1991. That action at that time was not "reasonable . . . from the standpoint of the performance capabilities of the contractor at the time the notice is given." *Id.* Thus, for the purposes of the waiver doctrine, Modification 3 did not reinstitute a new, binding completion date.[20]

### D. *The propriety of the termination for default.*

 "[A] default-termination is a drastic sanction . . . which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 57, 408 F.2d 424 (1969) (citation omitted). Furthermore, it is impermissible for the government to rid itself of contractual responsibilities through use of the termination clause. *McDonnell Douglas Corp. v. United States*, 35 Fed.Cl. 358, 368 (1996). It must, however, be stated that despite the severity of the default sanc-

tion, the contracting officer is generally given broad discretion concerning issuances of terminations for default, and receipt of a show cause notice places responsibilities upon the contractor that it must meet to avoid proper termination. "When the government issues a cure notice, in order for a contractor to avoid default, a contractor must be able to provide adequate assurances to the government that it can complete the contract requirements on time." *Composite Laminates Inc. v. United States*, 27 Fed.Cl. 310, 323 (1992). Additionally, the government "must consider all of the contractor's efforts to comply with the cure notice." *Id.* at 324 (citing *Cervetto Bldg. Maintenance Co. v. United States*, 2 Cl.Ct. 299, 302–03 (1983)).

 Setting aside for the moment the adequacy of SIPCO's response to the Show Cause Notice, the fact is that NASA terminated for default despite SIPCO's response. Thus, we must determine whether this drastic action was grounded on solid evidence, and therefore, legally justified. The burden of proof of such justification is on the government, "even when, as here, the issue arises in a suit brought by the contractor attacking the termination." *Sun Cal, Inc. v. United States*, 21 Cl.Ct. 31, 39 (1990) (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir.1987)). In evaluating the contracting officer's decision to terminate, the court asks if the CO's conduct was "arbitrary, capricious, or an abuse of discretion." *Hannon*, 31 Fed.Cl. at 148 (citing *Darwin Constr. Co. v. United States*, 811 F.2d 593, 597 (Fed.Cir.1987)). Where the court is convinced "that the defendant exercised proper judgment in terminating the contract for default, the court will not substitute its judgment for that of the contracting officer." *Composite Laminates*, 27 Fed.Cl. at 325 (citations omitted). But if the contracting officer failed to exercise his own independent judgment due to improper influence from another party, "it would represent an abdication rather than an exercise of his discretion." *McDonnell Douglas*, 35 Fed.Cl. at 368

---

**20.** As a further note, any suggestion of time being of the essence to complete the Phase I work is also contradicted by other evidence. As the reprocurement work commenced in July 1992, ten months after the termination for default was issued, and several months after Robison–Prezioso began its own Phase II contract, the court cannot conceive of any credible argument that time was ever again viewed by NASA as being of the essence.

(quoting *Fairfield Scientific Corp. v. United States*, 222 Ct.Cl. 167, 182, 611 F.2d 854 (1979)).

A useful analogy to this case is *Schlesinger v. United States*, 182 Ct.Cl. 571, 390 F.2d 702 (1968). In that case, the record demonstrated that no one on the government's side of the dispute properly exercised discretion in issuing a termination for default. Rather, the *Schlesinger* court found that "[p]laintiff's status of technical default served only as a useful pretext for the taking of action felt to be necessary on other grounds unrelated to the plaintiff's performance or the propriety of an extension of time." 182 Ct.Cl. at 583–84, 390 F.2d 702. Such a state of affairs seems echoed by the present case. The propriety of SIPCO's termination for default [21] is brought into serious question by the acceleration of NASA's supervisory activities, its unilateral setting of a new completion date, and the timing of Kono's discovery of the misapplication of the air monitoring guidelines. These appear to be more than mere coincidences but rather considered efforts to lay the predicate for SIPCO's default. Further, it seems apparent that NASA disregarded its responsibility not to hinder the efforts of its contractor during the summer of 1991. In this regard we find apposite the language of the *Schlesinger* court in stating, "[s]uch abdication of responsibility we have always refused to sanction where there is administrative discretion under a contract." 182 Ct.Cl. at 584, 390 F.2d 702 (citation omitted). Accordingly, this court finds NASA's termination for default of SIPCO was clearly improper. Therefore, the court orders conversion of the termination for default to a termination for the convenience of the government. *SMS Data Products Group, Inc. v. United States*, 17 Cl.Ct. 1, 10 (citing *Darwin Constr.*, 811 F.2d at 598).

### E. *Kono's authority to direct SIPCO's work.*

SIPCO contends that much of the NASA-directed work came at the behest of Ken Kono. NASA responds that even if that is the case, Kono was without authority to change the terms of the contract; only Carey was authorized to do that. Thus, if Carey did not direct it, the argument goes, it was not valid and cannot be held against the government.

In addressing the limits of Kono's authority, the court begins its analysis with the premise that "[a]s a general matter, the Government remains bound only by the words or actions of those possessed with authority to bind the Government." *Miller Elevator*, 30 Fed.Cl. at 693 (citation omitted). Therefore, it follows that "[i]n the event the Contractor makes any changes at the direction of any person other than the [C]ontracting Officer, the change will be considered to have been made without authority and no adjustment will be made in the contract price to cover any increase in costs incurred as a result thereof." *Design & Production, Inc. v. United States*, 18 Cl.Ct. 168, 205 (1989). Additionally, as a contractor dealing with a COTR arguably acting beyond his authority, "a person dealing with an officer or agent of the government must inform himself regarding the actual authority of such an individual." *Id.* at 206 (citing *Wilber Nat'l Bank v. United States*, 294 U.S. 120, 123–24, 55 S.Ct. 362, 79 L.Ed. 798 (1935); *Max Drill, Inc. v. United States*, 427 F.2d 1233, 1243, 192 Ct.Cl. 608, 624 (1970)). If our inquiry stopped here, SIPCO would be entitled to an equitable adjustment under the Changes Clause only for outside the scope work directed by Kevin Carey, and would receive nothing for those tasks in that category directed by Kono. However, even if Kono had no actual authority to bind the

21. The Court believes that SIPCO was never properly placed in default. Assuming that January 18, 1991 was the completion date, then NASA's failure to notify SIPCO of a new completion date until June 11, 1991 was not reasonable. The June 11, 1991 Modification serves to confirm NASA's earlier abdication of the right to enforce compliance with the January 18, 1991 completion date. Further, NASA on June 11, 1991 attempted to set August 16, 1991 as the new completion date, despite the fact it had to have known this was an impossible requirement on that date. Also, the issuance of a Show Cause Notice on August 7, 1991 contemporaneous with Carey's direction that SIPCO not move from the cone to Area 2, exemplifies the type of arbitrary and capricious behavior forbidden of the government.

government, the facts show he had implied authority. "[A] representative of the contracting officer can be found to have implied authority to make a change in the absence of the contracting officer, if the change is within, or reasonably related and consequent to the representative's official responsibilities...." *Id.* at 207 (citation omitted). Kono served as the COTR on the project and acted as the on-site representative of a CO who admittedly visited rarely. Kono, not Carey, authored the specifications that governed the project. It is obvious from Kono's daily inspections and other actions that Carey had delegated to him broad discretion in supervising this contract which Kono exercised daily. SIPCO reasonably concluded that Kono had been given near carte blanche power to determine issues arising under this contract. On these facts, we find that Kono possessed implied authority to bind the government.[22]

This case differs from those in which the specifications explicitly deny to the COTR authority to effect changes to the terms of the contract. In *Design & Production*, the solicitation that was incorporated as part of the contract expressly removed from the COTR "the authority to effect changes in cost or price totals or in any other mutually agreed upon provision." *Id.* at 206. *Design & Production* is distinguished from *Wieman v. United States*, 230 Ct.Cl. 563, 678 F.2d 207 (1982), which was cited in that opinion. In *Wieman*, the court's finding of implied authority was based on two factors: (1) the acquiescence and acceptance by the government of benefits accruing to it from direction by representatives of the CO; and (2) the fact that the representative was authorized, although not contractually, to direct plaintiff's work and plaintiff was expected to comply. The court finds this case closer to *Wieman* than *Design & Production*. Unlike the COTR in *Design & Production*, Kono was not expressly divested of any authority to direct SIPCO's work. As in *Wieman*, NASA

acquiesced to the benefits of Kono's direction. Despite Carey's relative absence from the project, he could not have been so blind as to be unaware of the "benefits" that accrued to NASA through Kono's direction. Finally, although Kono may not have been expressly authorized in the contract documents to direct SIPCO's work, it is obvious that he served as Carey's job site representative and alter ego for the project. It makes sense: Who better to monitor the progress of the job than the man who designed its specifications? Therefore, the court is satisfied that Kono exercised implied authority on this project. Therefore, we find that the government is liable for the damages and costs associated with his excessive direction.

**F. Constructive changes and equitable adjustments.**

■ Kono clearly made constructive changes to the contract by virtue of his implied authority. We now consider what those changes were. "A constructive change generally arises where the Government, without more, expressly or impliedly orders the contractor to perform work that is not specified in the contract documents." *Lathan*, 20 Cl. Ct. at 128 (citing *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 525, 455 F.2d 1037, 1050 (1972)). This statement supports SIPCO's claims. The doctrine provides recovery for contractors as "the rationale for constructive changes involves the objective of persuading a contractor to continue to work pending resolution of any dispute involving the work at issue." *Miller Elevator*, 30 Fed. Cl. at 678 (citing *American Line Builders, Inc. v. United States*, 26 Cl.Ct. 1155, 1176 (1992)). Therefore, application of the constructive change doctrine permitted SIPCO to continue working on the project without abandonment of its claims.

■ There are two basic components to the constructive change doctrine—the change component and the order/fault component. *Id.* at 678 (citing *Al Johnson*

---

**22.** *See also DOT Sys. Inc.*, 82–2 B.C.A. (CCH) P 15,817 (1982) "(Where the contract at issue did not contain a clause defining the COTR's responsibility, the Board said: 'the Court of Claims and this Board have ruled that where the contract or the contracting officer licenses technical person-

nel to give guidance or make decisions under the specifications, the government is liable for the consequences of the action taken.' (citations omitted))" *quoted in Design & Production*, 18 Cl.Ct. at 207.

*Constr. Co. v. United States,* 20 Cl.Ct. 184, 204 (1990)). "The 'change' component describes the work outside the scope of the contract, while the 'order/fault' component describes the reason that the contractor performed the work." *Id.* at 678 (citing *Embassy Moving & Storage Co. v. United States,* 191 Ct.Cl. 537, 545, 424 F.2d 602, 607 (1970); *Eggers & Higgins & Edwin A. Keeble Assocs. v. United States,* 185 Ct.Cl. 765, 785, 403 F.2d 225, 236 (1968)). In operation, a constructive change issue arises for work exceeding the scope of the contract "if the Government either expressly or impliedly ordered work outside the scope of the contract, or if the Government otherwise caused the contractor to incur additional work...." *Id.* at 678 (citing *Lathan,* 20 Cl.Ct. at 128). The question presented is whether the facts in this case support a finding that Kono's changes were constructive changes to the contract. SIPCO "must show the performance of work in addition to or different from that required under the contract (the change component), either by express or implied direction of the Government or by Government fault (the order/fault component)." *Id.* at 679. In assessing whether the work exceeds the scope of the contract, the court is guided by the principle that each case shall be judged according to its own facts, considering the scope and quality of the changes ordered and the cumulative effect of such direction on the project as a whole. *Ralph L. Jones Co. v. United States,* 33 Fed.Cl. 327, 334 (1995) (citations omitted). In any event, "the Government must have directed the contractor to perform the additional work," *Calfon Constr. Inc. v. United States,* 18 Cl.Ct. 426, 434 (1989) (citing *Singer Co., Librascope Div. v. United States,* 215 Ct.Cl. 281, 289–90, 568 F.2d 695, 701 (1977)), and the work may

not have been volunteered. *Calfon Constr., Inc. v. United States,* 17 Cl.Ct. 171, 177 (1989) (citing *Len Co. & Assoc. v. United States,* 181 Ct.Cl. 29, 38–39, 385 F.2d 438, 443 (1967)).

This case allows for an easy application of the facts to the law. The work performed outside the scope of the contract assumed many forms: excessive supervision and direction, tightened and smaller containment zones not contemplated by the contract documents or safety plan, and containment of interior areas. The project history is replete with instances of pervasive government interference and direction through the COTR. Modification 1 demonstrates mutual acknowledgment of the unforeseen intrusion of dust into the structure's interior and that there was pre-existing sand and debris on the exterior horizontal beams of the steel structure. The court reads the attached Scope of Work[23] as a direct acknowledgment on the part of NASA that not only was the tightened containment occurring at its direction as part of its plan to contain the internal penetration of the dust but also of the presence of pre-existing dust for which SIPCO was not responsible. Further, it is important to note that the internal containment NASA wanted done was in excess of the as-bid contract requirements. Therefore, NASA had an obligation to pay for it. This modification by its terms covered only Bents 37 through 42. SIPCO rightly expected to be compensated for all subsequent containment work of this nature that exceeded the requirements of the specifications. Not only did Kono expressly and impliedly order work outside the scope of specifications he authored, but the outside-the-scope work was, without question, in addition to that stated in the contract documents. Finally, judging

---

**23.** The Scope of Work clause calls for containment zones to be "sealed." However, there was no contract requirement of 100% containment. The court does not read this or any similar clause to require such containment. This is especially so in light of the earlier referenced May 6, 1991 memo from Kono to Carey where Kono acknowledged that the percent of containment was never specified. Moreover, the Scope of Work clause deals with internal not exterior containment zones. Given that the use of the word "sealed" in this Scope of Work is consistent with prior use, the court continues to read it as not

providing for 100% containment. Additionally, NASA places a great deal of significance on the capacity of SIPCO's dust collector. The court does not place great emphasis on this point. SIPCO demonstrated that it used negative air in its containment. As the contract specifications require SIPCO to comply with various environmental enactments, NASA's failure to link any problems involving SIPCO's employment of negative air with the violation of those enactments it was required to follow renders NASA's emphasis of this point misplaced and of little probative value.

this case on its own facts and evaluating the magnitude of the impact upon the project, the court finds that SIPCO has met its burden of demonstrating constructive changes through government direction by implied authority of the COTR.

 The government next argues that if SIPCO had claims for equitable adjustments because of constructive changes to the contract, SIPCO possessed the duty and the burden of informing the Contracting Officer. Initially, SIPCO's efforts were directed at attempting in good faith to comply with Kono's directions which it rightly believed Kono was empowered to issue. The rule as to notification of the CO is that "[w]ritten notice as to constructive changes must be supplied by the contractor before such time that the Government would suffer if not apprised of the facts." *Calfon*, 18 Cl.Ct. at 438. Furthermore,

> If the contracting officials have knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decisionmaking, the Government is not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs.

*Id.* at 438–39 (citation omitted). The government argues that it did not receive notice of SIPCO's complaints until claims were filed in April 1991 and July 1992. This argument is not supported by the facts. Much of the excess work was personally directed by Kono, and NASA received the benefits of his many interventions. Moreover, Kono and Walton were in almost constant contact during this critical period. We find that NASA well knew of SIPCO's problems at an early date and that NASA was not materially prejudiced by any failure by SIPCO to submit certain claims on certain days or in a more timely manner. SIPCO responded in a timely fashion once it recognized that the changes Kono had ordered were constructive changes beyond the requirements of the contract. As the court in *Calfon* stated, "Where contractor silence would foreclose less costly alternative solutions or the ability of the Government to avoid contractor claims, timely notice is required." *Id.* at 439. Since SIPCO's claims are a direct result of government misdirection and supervision, if not coercive intervention, NASA had timely knowledge of SIPCO's claims at least to the extent that it suffered no material prejudice from any delay in SIPCO's submission of claims.

 While the Changes Clause of the FAR permits the government to order changes within and outside the scope of the contract, the clause also provides for the remedy of equitable adjustment when those changes increase the cost or performance time. *Thermocor Inc. v. United States*, 35 Fed.Cl. 480, 492 (1996). "Generally, an equitable adjustment is justified by a change contrary to, or materially different from, the nature of the work contemplated by the parties to the contract." *Ralph L. Jones*, 33 Fed.Cl. at 334 (citing *Miller Elevator*, 30 Fed.Cl. at 677, 678). And where excess costs are incurred in attempting to perform a contract according to defective specifications, the contractor is entitled to an equitable adjustment as a means of compensation. *Hol–Gar*, 175 Ct.Cl. at 524, 360 F.2d 634.

 While SIPCO is entitled to recover its excess costs through an equitable adjustment, it "bears the burden of proving liability, causation, and resultant injury." *Ralph L. Jones*, 33 Fed.Cl. at 331 (citing *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 199, 351 F.2d 956 (1965); *Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 253, 416 F.2d 1345 (1969)). The standard of meeting this burden is, however, high. Before an equitable adjustment will be granted, plaintiffs are required to demonstrate that: (1) increased costs arose from conditions materially different from what the contract documents indicated and that such conditions were reasonably unforeseeable based on all information available to the contractor; and (2) the changes in the requirements caused the increased costs. *Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 33 (1987) (citations omitted). SIPCO has met this standard of proof. Convincing evidence shows that SIPCO's increased costs arose from Kono's maladministration of this contract and

that SIPCO could not have reasonably foreseen such conduct. Kono was at fault because of his misapplication and misinterpretation of the contract requirements. Again, the proper standard to which SIPCO should have been held was not *zero* escape of dust, or 100% containment, but one which allowed an amount of dust to escape not exceeding safe levels as determined by the regulations specified in the contract. His actions in 1990 to order smaller containments zones and smoke bomb tests were efforts to enforce a containment regime which SIPCO was not contractually required to meet. Undoubtedly, Kono administered this contract the way he subjectively conceived the project.[24] But he did not write the specifications that way. Accordingly, we find that SIPCO is entitled to compensation through an equitable adjustment for those changes outside the scope of the contract that directly resulted in increased costs to SIPCO.

### DAMAGES

#### A. Standard of measurement.

▮▮▮▮ The measure of damages recoverable through an equitable adjustment is based upon a well-established principle: "to safeguard the contractor against increased costs engendered by the modification[25] ... [Thus] the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which the contractor finds himself by reason of the modification." *Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1963). Additionally, where the changes were not the result of fault on the part of SIPCO, "an equitable adjustment requires that plaintiff be paid the increase in its costs over what they would have been had no

change been required." *Hol–Gar,* 175 Ct.Cl. at 524, 360 F.2d 634. In instances of increased costs due to government delay, "there can be no recovery without proof that that delay caused material damage," *Commerce Int'l Co. v. United States,* 167 Ct.Cl. 529, 542, 338 F.2d 81, 89 (1964) (citation omitted), and those delays "must occur on the critical path of a construction project." *Tyger Constr. Co. v. United States,* 31 Fed. Cl. 177, 257 (1994) (citing *Broome Constr., Inc. v. United States,* 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974)). In sum, where SIPCO's costs increased due to NASA-promulgated directives which caused delays affecting the critical path, SIPCO may recover as damages those costs that directly resulted from those directives.

▮▮▮▮ It is undisputed that some delays to the project were not solely attributable to NASA's actions. In fact, the court recognizes that on occasion SIPCO's work practices contributed to project delays. Because of that fact, the delays may be deemed concurrent or intertwined obligating the contractor to separate its delays from those which the evidence shows may be fairly assessed to the government. *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir. 1982). The reason for this requirement is that courts will generally not hold the government liable for delays without a showing by the contractor that the government caused the delay. *Tyger Constr.,* 31 Fed.Cl. at 256 (citing *William A. Smith Contracting Co. v. United States,* 155 Ct.Cl. 1, 9–19, 292 F.2d 847, 852 (1961)). Therefore, "[w]here both parties contribute to the delay, 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.'" *Blinderman,* 695 F.2d at 559 (quoting *Coath*

---

**24.** This is evident upon consideration of the Phase II contract performed by Robison–Prezioso. In that contract, NASA specifically provided for the tightened performance standards it had required of SIPCO. SIPCO's contract (Phase I), however, did not contain such standards. SIPCO cannot be held accountable for NASA's omissions. If NASA wanted tightened containment and the ability to use the BAAQMD 1.0 standard near the containment, it could have stated so in the Phase I contract as it did in the Phase II contract. Phase I was admittedly a learning experience for NASA. Hence, much additional

time and money was allowed Robison–Prezioso in connection with its performance of its contract.

**25.** Some of SIPCO's claims stem from increased costs and government-caused delays rather than written modifications to the contract. However, the word "modification," as used in this case, encompasses the types of constructive changes NASA imposed during its administration of this contract.

& *Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15 (1944)).

■ Although SIPCO must distinguish for the court those delays for which the government is responsible as opposed to its own, its standard for proving damages is not so high as to require amounts with "absolute exactness or mathematical precision." *Ralph L. Jones,* 33 Fed.Cl. at 336 (quoting *Electronic & Missile,* 189 Ct.Cl. at 257, 416 F.2d 1345). In fact, the court "needs only enough evidence to make a fair and reasonable estimate." *Id.* (citing *Miller Elevator,* 30 Fed. Cl. at 702; *Electronic & Missile,* 189 Ct.Cl. at 257, 416 F.2d 1345).

**B. *SIPCO's Amended Claim and the court's award of damages.***

At trial, SIPCO presented an "Amended Claim" to its July 1992 claim. The July 1992 claim and the Third Amended Complaint seek approximately $3.6 million in termination for convenience costs and equitable adjustments with interest and costs. However, in SIPCO's Amended Claim and its first post-trial filing it seeks a total of $2,296,-060.38 for costs relating to conversion of the termination for default to a termination for convenience ($769,632.20) and equitable adjustments ($1,526,428.18). SIPCO also seeks interest for the termination for convenience costs from the date of the termination for default, September 4, 1991, and for the equitable adjustments earlier set forth in its July 1992 claim submission (July 28, 1992). Further, SIPCO argues it is entitled to recover reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412.

**1. *Award of costs associated with conversion of Termination for Default to Termination for Convenience of the Government.***

■ The court has determined that the termination for default was wrongly issued. Accordingly, the court hereby converts that termination to a termination for convenience of the government. Under the applicable FAR clause incorporated into the contract,[26]

SIPCO is entitled to the cost of any work performed prior to termination. This amount includes the costs in rigging Area 2 before Carey's directive to cease and the contract balance due at termination.

On the subject of the remaining paint, NASA contends SIPCO failed to provide it with an inventory list per FAR § 49.104(e) that would have alerted NASA to SIPCO's possession of paint that could have been used on the reprocurement contract. SIPCO argues that the paint was of a type specially made for this contract and could not be returned to its supplier for credit. What the government omits is that FAR § 49.104(e) is a subpart to a subpart that states, "The notice and clause applicable to *convenience terminations* generally require that the contractor . . . ." *Id.* (emphasis added). Therefore, this clause is inadequate authority for the government's position. Since SIPCO was left with non-returnable paint after the wrongful termination for default, SIPCO is entitled to recover its costs for all unused paint. The demobilization costs, which came about because of the wrongfully issued termination for default, are also awarded to SIPCO. Finally, SIPCO may recover the costs assessed it by its surety to investigate NASA's demands and to arrange for reprocurement of the contract. In short, but for the termination for default, all of these amounts would have been due and payable to SIPCO or would not have been incurred as costs by SIPCO. Therefore, due to the wrongful termination for default. the court awards to SIPCO these costs totaling $769,-632.20 plus interest in accordance with applicable statutory guidelines.

**2. *Award of equitable adjustment for requests exceeding the scope of the contract.***

■ The court has stated that, to recover under a theory of equitable adjustment, SIPCO must demonstrate increased costs due to government delay affecting the critical path of the project. The court has recognized that SIPCO's work practices were imperfect. However, on a large-scale industrial project

---

**26.** The contract documents incorporated FAR § 52.249–2 Termination for Convenience of the Government (Fixed Price) (APR 1984) with Alternate I (APR 1984). These clauses were amended in 1996.

such as this one involving relatively new lead abatement procedures employed by personnel with limited training and experience, it is reasonable to expect that even a reasonably prudent contractor will encounter problems involving personnel, equipment, scheduling, and the like. Such problems may require the shifting of personnel and some reworking. However, such imperfections do not disqualify a contractor from recovery. The government has made a voluminous effort to portray SIPCO's work practices as flawed to the point of deserving denial of any compensation to SIPCO. Although the court recognizes that such commonly encountered work problems played a role in SIPCO's performance of this contract, our analysis of the evidence shows that its inefficiencies and errors were not excessive or abnormal for a job of this size and difficulty. To the contrary, it was the systematic and intrusive pattern of government interference that ultimately delayed this project and directly caused SIPCO's increased costs.

To the extent that SIPCO is obligated to distinguish its delay from that caused by the government, the court finds that the Delay Summary Bar Chart compiled by Mark Johnson presents the clearest picture of the impacts of delay to SIPCO's critical path. Pl.'s Ex. 206. Though the government may disagree with the analysis contained in the chart, it has failed to demonstrate sound reasons requiring the court to disregard it. Furthermore, the government analysis compiled by Ken Kono and David Finn by comparison appears to be flawed in methodology and calculation. For example, the primary documentary materials were the KTA–Tator paint inspection reports. The Johnson analysis presents a much more persuasive picture of how accumulated delays worked to push back the critical path work of blasting, cleaning, and painting.[27] Furthermore, the court finds it notable that the Johnson Summary, submitted by SIPCO, credits SIPCO with fewer days of compensable delay than it claimed in its July 1992 claim. Thus, SIP-

CO's prayer for total relief is about $1.5 million less than originally sought. The court therefore concludes that SIPCO has accounted for its delays in a reasonably accurate and persuasive manner such that the court has "enough evidence to make a fair and reasonable estimate." *Ralph L. Jones*, 33 Fed.Cl. at 336 (citations omitted).

SIPCO's claim for equitable adjustment also covers several other claims. SIPCO seeks just over $65,000 for increased handling of grit due to weight restrictions on the cone and for cleaning the cone by hand wiping instead of a water wash down. The specifications contained no restrictions on the activity that could take place on the cone nor did they inform SIPCO of any restrictions on the method of cleaning the cone. NASA directed removal of the accumulated grit on the cone. It had to be done in a particular labor-intensive manner. This constituted a changed condition to the contract in that SIPCO was directed to perform work in a manner unanticipated by the contract documents. NASA's argument that the matter of excess weight on the cone falls under the clause requiring SIPCO to protect government property misses the mark. Neither NASA nor SIPCO contemplated, through the specifications, any restriction of activity on the cone. Since NASA constructively changed that part of the contract, SIPCO is entitled to an equitable adjustment for its extra cleaning efforts.

The remainder of SIPCO's equitable adjustment claim seeks damages for already addressed matters discussed in the body of the opinion. As SIPCO has presented the court with an Amended Claim detailing the monies sought for an equitable adjustment because of requirements exceeding the scope of the contract, the court awards SIPCO $1,526,428.18 plus interest, pursuant to 41 U.S.C. § 611, dating from submission of the July 28, 1992 claim.

---

27. The court has reviewed defendant's claims regarding delays attributable to SIPCO's own work practices. It is true that SIPCO experienced problems of its own. However, the court finds that to the extent SIPCO's work practices contributed to delay of the project, any contractor delays were either exacerbated by government interference or the result of events of normal occurrence on a large scale industrial project.

### 3. *Award of reasonable attorneys' fees and costs.*

██ Pursuant to 28 U.S.C. § 2412, SIPCO seeks an award of its reasonable attorneys' fees and costs. It argues that it is the prevailing party and, further, that NASA's position was neither substantially justified nor reasonable in law or in fact. The court agrees. The court is of the firm opinion that NASA's maladministration of this contract was improper, unjustified, and in violation of the government's obligation of good faith and fair dealing toward its contractors. As a result, the court grants SIPCO's request for an award of reasonable attorneys' fees and costs.

### CONCLUSION

Based upon undisputed facts known to NASA prior to trial, defendant was well aware that at least some of plaintiff's claims had merit and that if the matter went to trial significant damages could be due plaintiff for these claims. It is now apparent to the court that this case, from the beginning, cried out for an early and fair settlement. Unfortunately, settlement did not occur and almost three weeks were spent in a highly contentious trial at great and avoidable expense to the parties.[28] Immediately after trial, at the court's request, counsel for the parties met informally with the court in chambers. The court stated its shock at Mr. Kono's damaging admissions during cross-examination and carefully explained to government's counsel what the court's ruling would likely be if no settlement was reached. The parties then agreed to attempt to negotiate a settlement during a thirty-day suspension period. No settlement was reached. The court was then compelled to issue its opinion. Unfortunately, it is the inevitable result of a final judgment in SIPCO's favor that the damages awarded plaintiff in this case ultimately will be paid by the American taxpayer.

This court has concluded that defendant's highly adversarial posture in this litigation reflects an unusually rigid and uncompromising attitude not justified by the facts. It is the court's further view that Mr. Kono's actions, undoubtedly taken in his zeal to secure the best possible performance by SIPCO, resulted in a grievous wrong being done to SIPCO and that it is this court's duty to rectify that wrong. We think it proper to state again exactly what the government's obligation is in dealing with its citizens who seek redress in this court for grievances done to them by the government. In this regard, we respectfully refer to Chief Judge Loren Smith's cogent and apposite statement as follows:

> It is the obligation of the United States to do right. Every free government can be judged by the degree to which it respects the life, liberty and property of its citizens. The United States stands tall among the Nations because it is a just Nation. In the instant cases the United States has not acted in a manner worthy of the great just Nation it is. Because the dollars at stake appear to be so large the government has raised legal and factual arguments that have little or no basis in law, fact or logic. While the court can appreciate the concerns of the government's attorneys to protect the public treasury, and they are honorable people, it must severely criticize the tactics and approach of the government....

*California Federal Bank v. United States,* 39 Fed.Cl. 753, 754 (1997).

For the aforementioned reasons:

1. The court GRANTS SIPCO's request to convert the termination for default of September 4, 1991 to one for the convenience of the government and awards $769,632.20, plus interest in accordance with applicable statutory guidelines, for the costs associated therewith; and

2. The court AWARDS an equitable adjustment to the contract in the amount of $1,526,428.18, plus interest pursuant to 41 U.S.C. § 611 from July 28, 1992.

---

**28.** During trial the court looked all witnesses in the eyes, viewed their demeanors, and on occasion directed questions to witnesses to better understand their testimony and judge their credibility. In general, based upon this approach and the entire record, the court has determined that SIPCO's witnesses offered highly credible and persuasive testimony. On the other hand, defendant's witnesses were evasive and far less credible.

There being no just reason for delay, the Clerk of the Court is to enter judgment in Nos. 1 and 2.

3. The court GRANTS SIPCO's requests for reasonable attorneys' fees and costs.

It is hereby ORDERED that the parties enter into prompt negotiations on the amount of the attorney fee award. The parties shall submit a joint report to the court of the results of these negotiations within thirty (30) days from the date of this opinion.

Costs to plaintiff.